Argued March 11, disbarred April 30, petition for rehearing
denied July 9, 1958

In re Complaint as to the Conduct of
# JOHN P. HANNON
324 P. 2d 753

*Wilber Henderson,* Portland, argued the cause for the accused-appellant.

*William M. Dale, Jr.,* Portland, argued the cause for respondent.

Before PERRY, Chief Justice, and LUSK, BRAND, WARNER, MCALLISTER and SLOAN, Justices.

PER CURIAM.

John P. Hannon, an attorney licensed to practice in the courts of this state, was found guilty upon three separate charges of professional misconduct by a duly constituted trial committee of the Oregon State Bar. The findings and recommendations of the trial committee were presented to the Board of Governors of the Oregon State Bar at a regular meeting on 8 November 1957, eleven of the twelve members being present. The Board by a unanimous vote approved the findings of fact of the trial committee upon the three charges and found the accused guilty of each and all of the charges set forth in the complaint. The Board, in harmony with the findings of the trial committee, then found that the conduct of the accused was unethical and in violation of the rules of professional conduct made and promulgated by the Oregon State Bar and constituted such conduct that, if the accused were now applying for admission to the Oregon State Bar his application should be denied. The Board rejected a more lenient recommendation by the trial committee and by a vote of ten to one recommended

to this court that the accused be permanently disbarred.

Pursuant to law, the accused filed a petition with this court praying that the proceedings be here reviewed and that the findings and recommendations of the Board be rejected, reversed or modified. The Oregon State Bar and the accused, by their respective attorneys, stipulated that the case be heard on the records of the proceeding, the petition for review and oral arguments. They waived the privilege of filing written briefs. The matter is now before us.

On the first cause of complaint the evidence establishes that the family of Mr. Witzel J. King was involved in an automobile accident on or about Labor Day 1955. The accused was employed to represent the injured parties. A settlement was made out of court. The insurance company in settlement delivered drafts totaling $4,050, in the amounts and to the payees, as follows:

To King and wife, and John P. Hannon, dated 3 May 1956     $3,200

To King and wife, and as parents and natural guardians of Dennis D. King, and John P. Hannon, dated 3 May 1956     $ 100

To King and wife, and as parents and natural guardians of Jay D. King, and John P. Hannon, dated 3 May 1956     $ 100

To King and wife, and as parents and natural guardians of Barbara King, and John P. Hannon, dated 3 May 1956     $ 100

To Lorraine King, as parent and duly appointed guardian of the person and estate of Jerry A. King, and John P. Hannon, dated 9 May 1956     $ 550

Of the total sum of $4,050, the Kings ultimately received $2,625 plus a later payment, the amount of

which is not clear in the record, but which was apparently their share of the $550 payment less fees.

King and wife were notified of the receipt of the drafts, and during the first part of May 1956 went to Hannon's office and indorsed the first four drafts. The accused did not then indorse the drafts. It apparently became necessary to make a correction in the wording of the fifth draft to show that it was payable to Lorraine King as parent and "duly appointed guardian" of Jerry. When the first four drafts were indorsed by King and wife, the accused said he would put them in the safe until the fifth draft was returned. The fifth draft bears date 9 May 1956. When the fifth draft was received Mrs. King went to Mr. Hannon's office and indorsed it. It was not then indorsed by Hannon, and none of the drafts were delivered to the Kings nor was any payment made to them at that time. Hannon told them that they would have to wait because it would take approximately two weeks for Jerry's money "to go through the courts." He said "it would be straightened up at that time completely." Thereafter Mr. and Mrs. King by telephone and personally made repeated contacts with Mr. Hannon "at times twice a day", but were "stalled off from one reason and another." The accused failed to keep appointments. At another time it was explained to Mr. King that he could not locate the files. On another occasion he gave as his excuse that "he had to go see Mr. Sack at the, Rocky Butte or Kelly Butte, whatever it is * * *." On another occasion Mrs. King was told that Mr. Hannon was not in his office, but they heard his voice answering the phone.

Under date of 17 October 1956 King wrote to the Oregon State Bar for help and advice in the matter of securing his money. On 22 October the Secretary

of the State Bar notified Hannon that the Board of Governors had directed him to ask for an explanation "of what appears to be an unconscionable delay." On 24 October 1956 a check was issued for $2,625, payable to Lorraine King and Witzel King, and signed:

"J. P. Hannon
"By M. R.     Special."

Mrs. King took the check to the Southeast Branch of the First National Bank and deposited part of it in their savings account and part in the checking account. On 29 October 1956 the bank sent her a form notice that the check of J. P. Hannon dated October 24, 1956 was NSF and charging her commercial account $1,625 and the savings account $1,000, or a total of $2,625. Shortly thereafter the Kings received a certified check for $2,625 which represented their part, namely, three-fourths of the insurance company's settlement for the personal injury claims of all of the King family except claim of the boy Jerry for $550. They did not receive payment of the money due on account of Jerry's claim until some time in 1957.

The accused testified and the record shows that the first four drafts were indorsed by all the payees including Hannon, and paid to Hannon on 24 May 1956. The proceeds were deposited in Hannon's account at the bank. The fifth check for $550 was paid 12 July 1956. Hannon testified as follows:

"Q How do you explain the delay in turning this money over to the Kings, having received it at the latest July the 12th, 1956 and having not paid it over until October 24th? What was the cause of the delay?

"A Well, the, I can't really tell that. I don't really know."

He testified further that he had one account in the U. S. National Bank which he used for his personal bills and as his office account. He testified:

"Q And I take it you deposited these checks in your own personal account, right?
"A That's right.
"Q And proceeded to use that money?
"A Yes.
"Q For your own personal business?
"A Yes. * * *"

His excuse was that he had substantial assets and "didn't intend to take their money."

The first charge in the complaint of the State Bar sets forth the facts substantially as above recited and alleges that the accused did "convert the sum paid to him for said drafts to his own use and benefit and caused said sum of money to become inextricably mixed and comingled with his personal funds." The truth of this charge is fully established. The evidence not only shows a comingling of the funds,—the return NSF of the check payable to the Kings demonstrates that he spent the money and reduced his account below the amount of the money to which the Kings were entitled.

The second cause of complaint against the accused charges that Arthur Burris died intestate on July 9, 1947. On 12 April 1948 the accused was appointed administrator, he having been attorney for the administrator, Harry R. Burris, prior to his appointment. The charge is that as attorney and later as administrator, assets of the estate, including personal property of the appraised value of $2,070 and cash in the sum of $1,108.46, came into his hands and that he has failed, neglected and refused to account for said

assets and has converted them to his own use and has caused said sum of money to become inextricably mixed and commingled with his personal funds. He is also charged with inexcusable and unconscionable neglect despite repeated demands, and failure and refusal to file a final account for several years. On February 10, 1956 he was removed as administrator and attorney by order of court.

The third cause of complaint is similar to the second except that it relates to the estate of Marie Trainer, of which he was appointed executor, and it charges the conversion of $3,926.64. In these two cases the accused also made restitution after having commingled the estate funds with his own and used them as his own.

■ We find John P. Hannon guilty as charged upon all three of the causes of complaint. The Rules of Professional Conduct adopted by the Oregon State Bar were approved by this court pursuant to statutory authority and perhaps pursuant also to its inherent power. They provide, in part, as follows:

> "A member of the state bar shall not comingle the money or other property of a client with his own, and he shall promptly report to the client the receipt by him of all money and other property belonging to such client." Rule 9, Rules of Professional Conduct, page 48.

In the pending case funds of clients were not only commingled with his own, but were used as his own.

*In re Dickey,* 163 Or 142, 96 P2d 205 involved charges of unprofessional conduct by an attorney who received two small sums of money belonging to clients and deposited them in his own account, after which

his account was attached by creditors. This court found some extenuating circumstances, but said:

"* * * We must not be understood as holding that these extenuating circumstances justify the defendant's misconduct or that he could relieve himself of liability by depositing his client's money in a bank to his own credit. On the contrary, he should have accounted to his clients promptly upon the receipt of money collected or received by him for them."

In a case far less serious than this one the court recently said:

"The practice of law is a learned and honored profession; it deals with honest duties to the public that cannot be over-emphasized; it insists upon the highest standards of conduct from its members; it cannot permit the selfish interests of individual practitioners to rise above the interests of their clients, for to do so would result in subversion of justice." Conduct of L. B. Sandblast, 210 Or 65, 307 P2d 532. See also *Kirchoff v. Bernstein,* 92 Or 378, 181 P 746.

These pronouncements of our own court cannot be too often emphasized.

From Corpus Juris Secundum we quote with approval the following:

"An attorney who has collected money for his client and not yet paid it over ordinarily holds the same as a trustee rather than as a debtor, and his duties and liabilities with respect thereto are much the same as any other bailee, trustee, or fiduciary.

"The attorney is under a strict duty to keep the client's funds separate from his own, in a place of reasonable safety where they will always be available for immediate payment to the client, and under no circumstances should he use the funds for his own purposes, or lend them to others, without his

client's knowledge and consent. * * *" 7 CJS 976, Attorney and Client, § 139.

The use of such trust funds for personal purposes by an attorney constitutes a wrongful conversion which is not rendered excusable by the mere fact that under pressure he makes restitution. *State v. January,* 353 Mo 324, 182 SW2d 323; *State ex rel. Nebraska State Bar Association v. Rein,* 141 Neb 758, 4 NW2d 829; *In re Cherry,* 116 Minn 448, 208 NW 197; *People ex rel. Black v. Smith,* 290 Ill 241, 123 NE 807.

■■ The rules promulgated by this court concerning professional and judicial ethics are not merely pious exhortations. They were established to be obeyed and they create rights corresponding to the duties imposed. The recommendation of the Board of Governors is approved and the accused is permanently disbarred.