Argued May 6, re-argued September 3, suspended
September 10, 1958

IN RE COMPLAINT AS TO THE CONDUCT OF
## DUANE CLAY MORROW, ACCUSED
329 P. 2d 482

*J. T. Monahan,* Milton-Freewater, argued the cause for Oregon State Bar. With him on the brief was Raymond S. Danner, Pendleton.

*Kenneth A. Morrow,* Eugene, argued the cause and filed a brief for petitioner.

Before ROSSMAN, J., Presiding, and LUSK, WARNER, MCALLISTER, SLOAN and O'CONNELL, Justices.

ROSSMAN, J.

The accused, Duane Clay Morrow, who was admitted to the practice of law in this state in September, 1953,

is before us upon a recommendation of the Board of Governors of the Oregon State Bar that he

> "be suspended from the practice of law in the State of Oregon for a period of three years and thereafter until such time as the Supreme Court of the State of Oregon shall find that the accused is in all respects qualified to accept the obligations and faithfully perform the duties of an attorney in the State of Oregon."

The recommendation was made by the Board pursuant to authority granted by ORS 9.540.

March 20, 1957, a complaint was filed by the Oregon State Bar which made four charges of unprofessional conduct against Morrow. One of the charges was later dismissed upon motion of the Bar. The trial committee (ORS 9.550) found him guilty upon the three remaining counts, and recommended permanent disbarment. The Board of Governors concurred in the finding of guilt which the trial committee had made, but, by a vote of eight to three, rejected the recommendation for permanent disbarment. The three minority members voted for permanent disbarment.

All of the charges of which Morrow was found guilty alleged in common that he commingled moneys of clients with his own and converted them to his own use. The wrongs were committed, according to the findings, during the spring and fall of 1956 while Morrow was engaged in the practice of law in Pendleton.

The accused frankly admits that he was guilty of the misconduct recited in the aforementioned three counts. The brief submitted on his behalf says:

> "* * * The misconduct of Accused was serious and cannot be condoned.
>
> "* * * Some form of disciplinary action is in

order and the form of discipline to be employed must depend on the nature and degree of the character deficiency as revealed by Accused's past conduct.

"It has been said that each man equals the sum total of his activities and experiences—add up what he's done and that is what he is. Accused's activities and accomplishments, except for the two-month period from mid-September, 1956, to mid-November, 1956, are worthy of the highest admiration and respect."

The accused was born September 22, 1922, and, therefore, was 34 years of age when his misconduct occurred. He was admitted to the Bar in September, 1953, and, accordingly, had practiced only three years when the period presented itself which resulted in this proceeding.

We will now take notice of the charges, the evidence pertaining to them and the explanation which has been offered for the misconduct.

The first charge follows:

"On the 15th day of October, 1956, the Accused was retained as attorney at law and counsellor for Ethel Louise Noonan in a criminal proceeding in the Justice Court, Pendleton District, Umatilla County, Oregon. B. J. Noonan, on behalf of his wife, Ethel Louise Noonan, posted bail in said proceeding in the amount of $100.00. As the result of the Grand Jury's returning a 'not true bill', the charge was dismissed against Ethel Louise Noonan. On or about the 7th day of November, 1956, the Accused secured from the Umatilla County Clerk a refund of the bail, and the said County Clerk made the check in refund thereof payable to Mr. B. J. Noonan in the amount of $100.00 and handed the same to the Accused for delivery to Mr. Noonan. On or about the 8th day of November, 1956, without the consent or knowledge of payee, the said

Accused forged the name of the payee, the said Mr. B. J. Noonan, to said check and converted the funds to his own uses and purposes."

The Bar employs the Noonan incident as the basis for three accusations against Morrow: (1) forgery; (2) conversion by Morrow of the proceeds of the check; and (3) the making by Morrow of a false explanation concerning the bail money whereby the Noonans were left ignorant of the fact that he had received and cashed the check. Morrow concedes that he cashed the check and converted its proceeds ($100) to his own use. In explanation, he maintained that his client had indicated that he wanted the proceeds of the check to be used by Morrow to pay the costs of instituting a civil proceeding for false arrest against the person who had caused Mrs. Noonan's arrest, and that he (Morrow) assumed that he had implied authority to endorse Noonan's name upon the back of the check so as to cash it. Noonan denied that he told Morrow to use the bail money to defray the expense of instituting litigation, but the Bar concedes that the evidence may reasonably support a belief that the parties discussed the institution of a damage action based upon the unwarranted arrest of Mrs. Noonan.

The Bar deems significant that the ink which the accused employed in writing upon the back of the county clerk's check the name of B. J. Noonan was of a different color than that with which he wrote his own endorsement. Morrow explained that he wrote Noonan's name in his office with his desk pen and that he did not write his own until the next day in the business establishment where he cashed the check. We cannot say that his explanation is untrue.

The following facts render it difficult for us to believe that the accused's purpose in cashing the check

was to provide funds for a civil suit: (1) The accused did not deposit the proceeds of the check in a special account. (2) After the accused had cashed the check and Noonan, ignorant of that fact, had inquired of him as to when the bail money would be refunded by the county clerk, the accused did not disclose that he had already cashed the check, but replied that red tape would delay refund of the money for two weeks. (3) Noonan, after learning from the county clerk that the refund check had been issued to the accused, confronted the latter with that fact and thereupon the accused made no claim that he was retaining the money for filing fees, but said, "I must have been drunk, or I would never do a thing like that." (4) The accused spent the proceeds of the check for his personal purposes.

Morrow attempted to justify his false explanation of which we have just taken note by saying that his client had showed declining interest in the civil proceeding and that, since he (Morrow) believed that the civil proceeding would result favorably to the Noonans, he sought delay in refunding the money so as to gain time in which to revive the Noonans' interest in the proposed civil suit.

■ We believe that Morrow was guilty of professional misconduct, not only in commingling his client's money with his own in violation of Rule 9, Rules of Professional Conduct, but also in endorsing, without authority, his client's name upon the back of the check. He made no effort in making the endorsement to indicate that he signed as agent for his client. See Opinions on Professional Ethics of the Association of the Bar of the City of New York, No. 173, in Opinions on Professional Ethics, Columbia University Press, New York (1956), p 83.

Further, we believe that the accused was guilty of professional misconduct in deceiving his client as to the situs of the refunded bail money. See Opinions of the Committee on Professional Ethics of the New York County Lawyers Association 87, id. p 562, in which the opinion is expressed that an attorney may not deliberately deceive his client, even on her physician's advice that it is essential to her health.

The second count alleged that the accused agreed, as part of his services in an adoption proceeding, to disburse money of his clients (husband and wife) to a physician and a hospital to whom the money in the amount of $237.25 was owing. The accused's clients wished to adopt a child only a few days old, and the payments that were due to the physician and the hospital were for services performed during the child's birth. The parties agreed in April, 1956, when the relationship of client and attorney was effected, that the accused's fee should be $160. After the relationship was begun, the accused informed his clients that the amount payable to the physician was $135 and that $105 was due to the hospital. Evidently an error crept into the calculations, for the total due the hospital and the physician was $237.25. The charge now under consideration alleges that the accused received from his clients the sums needed for the payment of the physician and the hospital, but that instead of using them for the agreed purposes he converted $50 of the money to his personal needs. The Bar's brief says: "* * * the appellant-petitioner converted client's money, namely, $50, to his own use." The accused's brief, referring to that sum, concedes: "There is no question but that conversion was committed." The amounts which the accused received from his clients were: May 4, 1956, $25; July 23, 1956, $150; Septem-

ber 7, 1956, $225. The total is $400. Since the attorney fee was $160 and the total due the physician and hospital was $237.25, Morrow possessed sufficient to discharge all obligations. The accused offered as explanation for his slothful disbursement of the money that his clients had instructed him to refrain from paying the physician until the adoption was completed. The clients conceded that, pursuant to advice given to them by the accused, their original plan was to withhold payment from the physician until the adoption was completed, but swore that after the physician had threatened to bring the matter to the attention of state authorities they feared that the threats, if pursued, might thwart the adoption proceeding, and thereupon directed Morrow to pay the physician at once. In response to a request by Morrow, the clients sent him a check for $225 September 7, 1956, which was sufficient in amount to discharge the physician's charges and the balance of the attorney fee. The check was cashed by Morrow September 10. September 17 the clients informed Morrow by letter that they were "pretty upset" over the fact that the physician's bill had not been paid. October 19, 1956, the physician's bill was still neglected. At sometime [the record does not disclose it precisely] the accused paid the physician $75. As we have seen, he admitted that he spent for personal needs $50 of the proceeds of the check in the denomination of $225 above the amount to which he was entitled as a fee. After the clients had received a threatening letter from the physician and had consulted another attorney, they filed a complaint with the Oregon State Bar. In November, after the accused had learned from his clients that another attorney had completed the adoption proceeding, he refunded to them $50 which he should have sent to the physician

upon receiving (on September 7) the check for $225. We add that the accused had agreed to refund the money before his clients had informed him that they had filed a complaint with the Oregon State Bar.

The clients expressed a belief that Morrow did not intend to deprive them permanently of their money, and explained that their main complaint arose out of the delay to which he subjected them in the adoption proceeding. The clients testified that the accused lost weight in the period of their association with him and that he showed signs of strain. They also noticed, so they swore, worry on his part and a change in his personality. The accused admitted that the delay to which he had subjected his clients was unjustifiable. He explained that his action was due to the amount of attention his personal affairs demanded and the strain to which their unfavorable condition subjected him.

The misconduct which is alleged in the third count arose out of services that the accused rendered to a client, who was a married man and who was charged with contributing to the delinquency of a minor. After acquainting himself with the relationship between the parties, Morrow advised his client to divorce his wife and then marry the minor. He was hopeful that the charge against his client would not be pressed if the marriage occurred. When his client approved the program, Morrow sought the consent of the minor's father to the contemplated marriage. The father demanded $100 for his consent, and explained his demand by saying that the sum would reimburse him for expenses he had incurred in connection with the criminal charge. September 8, 1956, Morrow received a check for $100 from an aunt of his client, made payable, as he had directed, to himself with instructions to use

it for the sole purpose of securing the father's consent. It is agreed that Morrow's fee for his services had been paid in full. Morrow was instructed to obtain the consent as cheaply as possible and to return to the aunt any surplus if consent was gained for less than $100. Morrow's client and the father of the minor knew that Morrow had received the check. Upon its receipt, Morrow cashed it and appropriated the proceeds. The father refused to grant his consent for less than $100. The marriage was performed September 12, 1956, and the criminal charge was later dismissed. After receiving two letters, one on September 27 and the other on October 3, from an attorney employed by the father, Morrow paid the latter $20. The remaining $80 was paid May 30, 1957, after the disciplinary proceedings under consideration had been instituted and upon the eve of their trial.

The foregoing describes sufficiently the accused's misconduct. The accused freely conceded that he had misappropriated, in the three instances aforementioned, money which belonged to others, but swore that he did not intend to deprive permanently anyone of his money.

The problem which remains for solution is the nature and extent of the remedy which should be decreed. Proceedings of this kind are not penal in character, although the very fact that a disbarment proceeding is instituted is often more injurious to an accused's future than if a criminal prosecution had been begun against him. No one need labor the matter to establish the fact that the consequences of disbarment are severe. It not only degrades the attorney, but also deprives him of the means of earning his livelihood in the manner for which he had prepared himself at considerable effort and expense. The dis-

barment will not only terminate his services in his chosen profession, but may also cause his rejection by employers, such as banks and fiduciaries, who shun those of sullied character. Complete disbarment is, therefore, generally reserved for those whose unfitness for the further practice of the law is well established. However, the courts are conscious of the fact that the office of attorney is one of public trust and that if a proceeding of this nature discloses that the accused evaded the ordinary rules and restraints to which members of the profession must conform, the court is forced, for the protection of the public and the profession itself, to take whatever measures may be necessary, however harmful to the accused the result may be.

■ In their effort to reveal the needed remedy, the briefs submitted by the Bar and the accused cite precedents showing what was done in other cases in which an attorney appropriated to his own use the money of his client. Obviously, those cases are enlightening, but we believe that we must take into account not only the fact that the accused appropriated to his own use the moneys of three of his clients under the circumstances above mentioned, but other factors to which we will now give attention.

Obviously, a weak spot in Morrow's moral fiber enabled him to conduct himself in the reprehensible manner which is disclosed by the foregoing. If the weak spot is permanent in character and cannot be overcome, then we have no alternative except to eject him permanently from the profession. But if the accused's moral fiber can be restored and he can again serve honorably as an attorney at law, he should be permitted to reclaim his place in the profession, upon furnishing adequate proof that no further derelictions will occur.

For the purpose of seeking the cause of the accused's professional misconduct and its extent, we will take note of further evidence found in the record.

Morrow is now 36 years of age. He enlisted in the Navy at the age of 18. Subsequent to his discharge from the Armed Forces, in which he underwent a harrowing experience, he married and returned to his native state where he enrolled in the University of Kansas. During his undergraduate years he became the father of two children and, although he worked full time in order to support his family and assist his two younger brothers, he maintained such high scholastic standing that he was elected to Phi Beta Kappa. After graduating from college, he entered the law school of the University of Kansas. In his second year he was elected president of his class, and in his third he was chosen president of the student body of the law school. In 1953, as we have mentioned, he was admitted to the Oregon Bar. During the next two years he was employed by a law firm in Pendleton which enjoys an excellent reputation. This employment was terminated in September, 1955, and in the following December he opened his own law office.

When Morrow opened his law office he was the father of four children. In addition to maintaining a practice, he found it necessary, in order to meet his obligations, to work the second shift in a local factory. His hours were from 4:30 p. m. to 1:15 a. m. Notwithstanding his industry, he still was unable to meet his expenses. In the spring of 1956 marital difficulties, which began while he was in law school, had reached a stage where it was thought best for him to separate from his family. On his return from driving his family to the coast for the summer, Morrow fell asleep at the wheel of his car and caused a collision. For two

days he was hospitalized. He had no liability insurance and, since he was deemed at fault, he agreed to pay damages in the amount of $4,800.

The succession of episodes of which we have taken brief notice brings us to the point in Morrow's life in which his professional misconduct occurred.

Dr. Dean Kent Brooks, Superintendent of Oregon State Hospital, who had known the accused's parents when they and he lived in Kansas, gave testimony which sought to reveal the reasons for Morrow's lapse from his previous high standards. He expressed the belief that the accused did not suffer from any mental illness or disease, but explained:

> "* * * many of the things that have happened pointed up an immaturity reaction on the part of Mr. Morrow. * * * He has experienced many traumatic events and perhaps has not handled his experiences as creatively as most other people would."

Dr. Brooks thought that it was probable that Morrow's "many traumatic events," together with his sensitive nature, had lately affected his judgment. We quote again from Dr. Brooks:

> "I feel that if he would seek help on a fairly long-term basis of a psychiatric nature he definitely can be helped. * * * I think, too, that another thing that would help him is that he be placed in a situation where he has a fairly set routine to follow through, to be in a firm where he has certain duties to carry out and so forth rather than to be left on his own at this particular place."

The foregoing completes our review of the evidence.

Mr. Henry S. Drinker, chairman of the Committee on Professional Ethics and Grievances of the American

Bar Association, states, in Legal Ethics, Columbia University Press (1953), pp 45, 49:

> "* * * When a lawyer is disbarred it is because the court has concluded after thoroughly investigating and considering the charges against him as well as his explanation of them and his past record as a lawyer and a citizen and after giving him the benefit of every doubt that he is not one who should be a member of this honorable profession. If after such investigation the court believes his misconduct is perhaps not chronic, and that his lapse is but temporary and his point of view remediable, he should not be disbarred but put on probation by suspension either for a definite period or preferably until further order of the court during which period his conduct can be under supervision."

It will be noticed that Morrow's acts of misconduct occurred in a comparatively short period of time. Until they had taken place, he had conducted himself in a creditable manner and had displayed unusual promise. In order to secure his education and support those to whom he owed a duty, he had employed commendable industry. While he was making progress he was under the supervision of others and was surrounded by his family. He resorted to the money of others after he had left a well-paying position with a law firm and domestic difficulty had reached such proportions that the family home was disrupted. Then came the automobile accident, the hospitalization and the debt of $4,800. While practicing alone and attempting to support his family, which had left Pendleton, Morrow committed his misdeeds. We believe that we are justified in taking into account Dr. Brooks' explanation for the accused's departure from his previous course of exemplary conduct.

■ Personal difficulties and strain are no excuse for professional misconduct. It is assumed of members of

the Bar that if their fealty to the standards of the profession is put to the test they will not be found wanting. For some the occasion never arises; they are fortunate.

██ Following his misfortunes in Pendleton, Morrow quit the practice of law and left that city. After disclosing his misdeeds to a prospective employer, he was accepted into the latter's employ as a bookkeeper. Although it is argued that the accused is at present in somewhat easier financial circumstances, that fact, in the present proceeding, is irrelevant. Trust in professional deportment cannot be made to depend upon the existence of favorable circumstances, but we are not convinced that he should be kept out of the profession permanently.

The recommendations of the Board of Governors are approved. At the end of the period of three years Morrow may apply for reinstatement. If he then establishes that he is prepared to accept and faithfully discharge the responsibilities of the profession the Board of Governors, after an analysis of his showing, may make a recommendation to this court.

The appropriate order of suspension will be entered.

WARNER, J., did not participate in this decision.

McALLISTER, J., dissenting.

In my opinion, the accused should be permanently disbarred. See *In re Hannon*, 214 Or 51, 324 P2d 753.