**In re C. A. RANDOLPH.**

No. 45936.

Supreme Court of Missouri,

En Banc.

May 8, 1961.

Motion for Rehearing or for Judgment of Acquittal Denied June 12, 1961.

Gene Thompson, Maryville, Robert L. Ross, Albany, for informants.

Walter A. Raymond, Paul Barnett, Kansas City, for respondent.

WESTHUES, Judge.

On October 22, 1956, the Advisory Committee of the Missouri Bar, created by Supreme Court Rule 5, V.A.M.R., filed an information in this court charging the respondent C. A. Randolph with violating Rules 4.28, 4.34, 4.11, 4.47, 4.10, and 4.42. On October 25, respondent filed his entry of appearance and on November 23, he filed an answer denying the charges.

Robert V. Niedner of St. Charles, Missouri, was on March 13, 1957, appointed Special Commissioner "to hold pre-trial conferences, subpoena witnesses and records, hear evidence; compel the attendance of witnesses and the production of books, papers and documents; to issue attachments therefor; to hear and determine all objections to testimony in the same manner and to the same extent as this Court might in the trial of the cause before the Court; and to report the evidence taken, together with your findings of facts and conclusions of law."

The Special Commissioner held numerous hearings. Many witnesses testified and countless exhibits were introduced as evidence. The Special Commissioner filed his report on July 15, 1960. The Commissioner found that respondent had accepted personal injury cases with knowledge that they had been solicited by lay-

men and that he had split fees with laymen who had caused injured persons to employ respondent in their cases. The Commissioner further found that respondent had followed a scheme to conceal the solicitation of cases by laymen and to conceal the true basis for the remuneration of the solicitors; further, that respondent continued to follow this practice after he had been warned of the questionable nature of this practice by the Advisory Committee in 1946.

The Commissioner found that advances to clients in the way of loans or for living expenses as made by respondent were not in violation of Rules 4.10 and 4.42.

The Commissioner recommended that respondent be suspended from the practice of law for one year and that the cost of this proceeding be taxed against him.

Respondent excepted to the Commissioner's report finding him guilty of the charges of accepting cases solicited by laymen and splitting fees with them.

The Advisory Committee excepted to the ruling of the Special Commissioner finding the respondent not guilty of violating Rules 4.10 and 4.42 by making an advance of $4,025 to W. W. Goodner who was a client of respondent; further, the Committee excepted to the Commissioner's recommendation that respondent be suspended for one year. The Committee takes the position that under the evidence the respondent should be disbarred from the practice of law.

The cause was argued before the Court en Banc at the 1961 January Session and briefs were filed.

It has often been said, in cases of this nature, that "It is not a pleasant duty when Courts are required to sit in judgment upon a member of the bar but protection must be afforded against professional misconduct and the continuance of the exercise of the privileges of the office of attorney by one who has forfeited such privileges." In re Conner, 357 Mo. 270, 207 S.W.2d 492, loc. cit. 498(13). It may be further said that it is a very distasteful and unpleasant task for the members of the Advisory Committee to investigate complaints made against members of the Bar and when justified, to file charges. The members of this Committee are men of high integrity and discharge their duties with impartiality. Appointments to this Committee are not sought. Lawyers accept appointment on the theory that they have been requested to perform a public service. What prompted the above remarks will be stated later in this opinion.

Respondent's evidence shows that he was born in the State of Mississippi where he went through grade school. Later, he moved to the State of Kansas where he received a high school education; attending the University of Kansas, he received an A.B. Degree in 1916, and an LL.B. Degree in 1918. In June, 1918, he took the Missouri Bar Examination and passed. Thereafter, and up to the present time, he has been a resident of Kansas City, Missouri.

Respondent began his legal career in a claims department of an insurance company, The Fidelity and Casualty Company of New York, with the privilege of engaging in private practice along with his work. He continued in this work for about thirteen years, gradually building up a law practice of his own. In 1931, he formed a partnership with Ed McVey and in 1933, Spurgeon Smithson and Stanley Garrity joined the firm. This firm was dissolved in 1938 but McVey and Randolph continued as a firm until late in 1939. From 1940, respondent practiced alone. Respondent testified that all of the above-named men with whom he had been in partnership were outstanding lawyers of excellent reputation and were classed among the best. We take that to be true. Respondent also bore a fine reputation. A Justice of the U. S. Supreme Court, a U. S. District Judge, two members of the Kansas City Court of Appeals, Judges of the Circuit Court, and

many reputable lawyers testified without qualification that respondent's reputation as an ethical, honest, and able lawyer was excellent. We say with candor that we wish we could stop at this point. However, duty urges us to look at the other side of the picture. We do so reluctantly because we have found the other side of the picture to be in sharp contrast with the one just described.

Respondent testified that he soon learned, while working for the insurance company, the value of investigating claims and the time required for such investigations. Respondent stated that in 1921 the widow of a man named Louis M. Willgues came to him stating that she lived in Jackson County, Missouri; that her husband, employed by the Pennsylvania Railroad, had been killed in an accident at Pittsburgh, Pa.; that she had been to see a number of lawyers and had been told she could not maintain her suit in Kansas City because the railroad could not be served with process in Jackson County. Respondent took her case and obtained service by attaching 500 boxcars of the Pennsylvania Railroad located in the yards at Kansas City. Respondent, in his evidence, stated that he received much publicity because of the Willgues case and soon developed a reputation by reason of that case. The case was tried before a jury. On appeal to the Supreme Court, the verdict of $20,000 was by remittitur reduced to $13,000 and affirmed for that amount. See Willgues v. Pennsylvania R. Co., 318 Mo. 28, 298 S.W. 817. The files of the case in this court disclose that an amended petition was filed in the Willgues case on April 20, 1922. The case was tried in April, 1924. It was decided by this court on October 10, 1927. Our files show that Jules Rosenberger tried the case for the plaintiff, examined all of the plaintiff's witnesses, and cross-examined the witnesses for the defendant. Respondent, no doubt, obtained service on the railroad by attachment which we find to be the only unique fact connected with the case. In other respects, it was an ordinary run-of-the-mill

damage suit under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.

It would be odd, indeed, that, as claimed by respondent, the Willgues case acted as a magnet to draw many F.E.L.A. cases to his office. Respondent stated that the Willgues case came to the attention of Robert J. McDonald, a lawyer in Minneapolis, Minnesota; that McDonald came to his office in the latter part of 1922 and made arrangements with respondent to handle cases which were to be filed in Kansas City in which McDonald was interested. (Note that the Willgues case was not tried until 1924.) Be that as it may, we shall concede that the service by attachment in the Willgues case attracted McDonald's attention. Respondent testified that for awhile he was paid a small retainer of about $250 a case and a per diem fee for work in connection with a case. Later, cases were referred to respondent by McDonald on an association basis. In these cases, the lawyer's fee would be divided 1/3 to respondent, 1/3 to McDonald or his firm, and 1/3 to an investigator employed by the McDonald firm. Respondent was asked if that arrangement was inconsistent with the usual practice in such cases. His answer was, "Yes, I think in ordinary litigation the person who actually handles it usually gets at least half, if not two-thirds of the fee, so there is that very distinct difference between that type of practice and the usual referral law business." To the question, "And the explanation was that the other third was needed to investigate the cases?", respondent answered, "That is what they all said in different places."

To illustrate how cases were handled, respondent referred to a case that was settled in 1945 or late 1944 with this statement: "Well, here is one case of Adams v. The Kansas City Terminal, it was referred to me on that basis. Settlement was $12,000 and they had a contract with the client on a 33⅓ percent basis, which, by the way, under the statutes of Minnesota is the most that lawyers can take the contract for

with a client. After deducting the expense of the case, $199.76, their fee was $3,933.41. The third fee was, 'C.A.R. share one-third, $1,311.14,' and I remit to McDonald and DeParcq two-thirds of the fee plus any expense or loans that they may have had in the case with the client." Respondent testified that many other cases were settled on the same basis. Note that the Adams case was against the Kansas City Terminal. So it was a Jackson County case but McDonald, living in Minneapolis, was employed by Adams.

Going back now to the years following 1930, we note that respondent testified that his association with McDonald was interrupted for about twelve years beginning in 1931, when he formed a partnership with McVey, until about 1942, after he had dissolved partnership with McVey. Respondent's explanation for this interruption was, as he stated, thus: "Well, it applies not only to McDonald but all firms that specialize in F.E.L.A. cases. They all dropped me like a hot potato, not because of anything against me personally but because they couldn't sell me to their clients inasmuch as I was representing in a firm that was defending these cases. They were very suspicious, railroad employees generally are very suspicious of lawyers who are engaged in defending insurance companies or railroad companies or any other corporate clients so they dropped me for a period from 1931, late '31, until 1942, about 12 years."

We shall now dig a little deeper into the record where we find that respondent testified that the members of the Kansas City Bar with whom he had been associated as partners were men of the highest integrity. To this we agree. Let us, at this point, acquaint ourselves with McDonald of Minneapolis, Minnesota, with whom respondent transacted business and with whom he was associated in many F.E.L.A. cases. We state at the outset that if a medal should be offered for the most efficient, persistent, persistent, brazen, and notorious "Ambu-

lance Chaser" of all time, McDonald would be a strong contender for that medal. Why do we say this? First, because of McDonald's admissions to that effect in open court; and second, because a number of courts designated him to be such. The Supreme Court of Wisconsin in June, 1929, in Chicago, M., St. P. & P. Ry. Co. v. Wolf, 199 Wis. 278, 226 N.W. 297, loc. cit. 299, had the following to say of the firm of which McDonald was a member: "The conduct of the attorneys in this case is not only unethical and shocking to the professional conscience of any right-thinking lawyer, but violative of ordinary professional decency. The conduct of the lawyer who was described as 'flying the black flag of piracy' (Ellis v. Frawley, 165 Wis. 381, 161 N.W. 364) was almost innocent compared with what was done by this firm of attorneys in securing business. The only refreshing note in the whole sordid mess is the breezy buccaneer-like confidence of Mr. McDonald, apparently born of association with an organization so invincible that he feels safe not only in violating the laws of a sister state and the canons of professional ethics, but in flaunting the violation in the face of his accusers as if to say, 'Here it is, what are you going to do about it?'" The court in that case (226 N.W. loc. cit. 298) also approved a finding made by the trial court to the effect that the firm of which McDonald was a member maintained a "'high-pressure, high-powered' department, thoroughly organized, for the purpose of soliciting legal business in the State of Wisconsin, and other States, through men of experience in this line of activity employed by said firm to do the work commonly termed 'ambulance chasing.'"

In March, 1924, the U. S. District Court of Minnesota had the question of "ambulance chasing" on the part of the McDonald firm under consideration in two cases, Chunes v. Duluth, W. & P. Ry. Co., 298 F. 964, and Weinard v. Chicago, M. & St. P. Ry. Co., 298. F. 977. In each case, the clerk of the court was instructed to trans-

mit to the State Board of Law Examiners of Minnesota a record of the case for such action as that body might deem appropriate. In the Chunes case, 298 F. loc. cit. 976(2), we find the following statement by the court: "On the hearing of the motion to remand, in which his firm represented the plaintiff in another personal injury case heard about the same time, Mr. McDonald was charged by the opposing attorney with practicing 'ambulance chasing,' and replied, admitting the fact. In answer to a question from the court if he realized the nature of the admission he had just made, he replied: 'Of course I do. It is the truth, and why not admit it?'"

In December, 1938, the Supreme Court of Minnesota, in the case of In re McDonald, 204 Minn. 61, 282 N.W. 677, 284 N.W. 888, disbarred McDonald from the practice of law. The court granted McDonald leave to apply for reinstatement after the expiration of three years. The court reinstated McDonald on *October 8, 1940*. See In re McDonald, 208 Minn. 330, 294 N.W. 461.

The fact that McDonald and his associates in Minneapolis were ambulance chasers is not to be charged against respondent unless he knew of their activities and participated therein. Respondent testified he had no knowledge of the unethical practices:

"Q. Now, did you ever have any knowledge or information as to how either McDonald or DeParcq or any of the rest of these lawyers who referred cases to you, how they obtained those cases or under what circumstances the cases were brought to them? A. Well, as I have explained already, that in the first two or three years when I was just carrying water, you might say, I didn't know too much about those cases but when they made the arrangement with me for me to handle the case except for the investigation on a third of the fee basis, then they would send their investigation file or part of it at least to me and oftentimes I would see either the original letter from the client or a copy of the original letter in which he said so-and-so, 'your former client has recommended you to me and my case is so-and-so, and I wonder if you would be interested in handling it.'

"Q. Did you have any reason to doubt the genuineness or bona fides of those communications you saw in the files? A. None whatever.

"Q. Did you ever have any reason to question the basis under which any of these cases that might have been referred to you subsequently were obtained by McDonald or DeParcq or any of these other lawyers? A. I saw nothing in the files and I think the files were fairly complete when they were referred that would even remotely suggest indications of that kind."

When respondent's activities were being investigated in 1946 by the Advisory Committee, he was called as a witness to explain his connection with McDonald. In the course of this examination, he testified that in December, 1924, a case was pending in the Circuit Court at Independence, Jackson County, Missouri, wherein he and the firm of McDonald and Dahl were interested. When the case came on for trial, Leslie Welch representing the defendant filed a motion to prevent McDonald or Dahl from appearing in the case. Respondent stated that Welch read from an opinion by Judge McGee of the U. S. District Court. The trial court sustained the motion to bar McDonald or Dahl from the case and respondent tried the case for plaintiff. The McGee opinion, reported in 298 F. 964, is the case referred to supra wherein Dahl and McDonald were accused of being ambulance chasers and wherein McDonald admitted the charge. That opinion is dated March, 1924, only a few months before the incident at Independence took place. So, in 1924, respondent had actual notice that his associates at Minneapolis

were in the business of soliciting personal injury cases, especially F.E.L.A. cases. With respondent in possession of such knowledge and considering all of the notoriety concerning McDonald's activities, including his disbarment in Minnesota, we must conclude that respondent was well aware of the situation. Yet, in spite of the knowledge obtained in 1924, respondent, during the years from 1924 to 1930, actively took part in that business and agreed to split the attorney's fee 1/3 to respondent, 1/3 to the Minneapolis attorneys, and 1/3 to the so-called investigators who were in fact solicitors. Furthermore, after an intermission of about twelve years, during which time respondent was a partner of McVey, respondent resumed his association with McDonald. That was after McDonald was reinstated as a member of the Bar of Minnesota. John F. Dahl was suspended for six months from the practice of law in the State of California in July, 1931, on a charge of soliciting cases and dividing fees with solicitors. Dahl v. State Bar of California, 213 Cal. 160, 1 P.2d 977.

Respondent testified that when he formed a partnership with McVey, people interested in personal injury cases "dropped me like a hot potato" and remained away for twelve years. This, according to respondent, was because the firm was representing insurance companies and acting as defense lawyers. The record refutes this contention by respondent's own evidence. He testified that while working for an insurance company from 1920 to 1930, he handled many personal injury cases. Note further that after he resumed his association with McDonald and during the years following 1940, respondent says that three fourths of his business was defense work in representing large corporations and insurance companies. Respondent named eight different corporations and insurance companies that he had represented during that time. In spite of that, instead of dropping him like a hot potato, those with F.E.L.A. cases came to him like flies to molasses. So, whatever the reason that F.E.L.A.

cases did not come to respondent between the years 1930 and 1940, it was not because respondent represented insurance companies.

The charges against respondent concern cases that were handled after 1940. The events occurring prior to that time are material only in so far as they demonstrate that respondent well knew that the firm of which McDonald was a member had for many years solicited F.E.L.A. cases and had split fees with lay solicitors. After 1940, when respondent resumed his association with McDonald, the fees in the cases which respondent handled in Kansas City were processed in the same manner as others had been between the years 1920 and 1930, that is, 1/3 to respondent, 1/3 to McDonald, and 1/3 to a so-called investigator. The only difference was that McDonald changed his manner of dealing with the solicitors. The Supreme Court of Minnesota, in the disbarment case, found (loc. cit. 683(11) of 282 N.W.) that McDonald "in spite of the warnings and advice of the state board of law examiners, he has persisted in such practice, merely severing his relations with certain attorneys officing with him and discharging his brother Donald, the chief solicitor, at the request of the board." The record shows that in 1946 McDonald had thirteen cases pending in Chicago, Illinois, against railroads. In such cases, five plaintiffs lived in Kansas, five in New Mexico, one in Louisiana, one in Iowa, and one in California. A suit was filed in Chicago charging that McDonald had acquired the cases through systematic solicitation of F.E.L.A. cases.

In June, 1946, the Advisory Committee notified respondent to appear before the Committee on July 11, 1946. In response to that notice, respondent testified before the Committee with reference to his dealings with McDonald and DeParcq who were associates at that time. It was at this hearing that respondent testified that, in 1924, the court at Independence had barred McDonald and Dahl from appearing in a case

because they had been found guilty of soliciting cases. In that hearing, that is, July, 1946, it was also brought to light that DeParcq, who was associated with McDonald after 1940, had been barred by a federal judge from appearing in a case until a showing was made that the fee was not to be split with the Brotherhood, a railroad association.

The cases in which respondent participated with McDonald became less in number as time passed. During the years after 1940, and before McDonald died (July 5, 1947), respondent became acquainted with a number of so-called investigators who had dealings with McDonald. Among these were C. C. (Cliff) Jennings, Norman Fenn, W. J. Yearsley, and O. C. Brown. These four men had dealings with Randolph and received fees on a percentage basis in cases wherein Randolph claimed the men performed services in investigating the cases. The manner in which the cases were brought to respondent's office followed the same pattern. We do not deem it necessary to deal specifically with all of the cases but we shall review a number of cases in which Jennings, Brown, and Fenn participated.

After July, 1946, at which time respondent testified before the Advisory Committee, the Committee made further investigations concerning respondent's activities in procuring F.E.L.A. cases. Charges were filed in October, 1956. Thereafter, the case was heard by the Special Commissioner and his report was filed in this court. The Advisory Committee, in the brief filed in this court, contends that the evidence supports the charges. Respondent insists that the evidence is insufficient to support any of the charges. Note what is said in respondent's brief: "In addition to respondent's testimony that he never employed or paid a runner to solicit cases for him, all of his former clients who testified (with a single exception, Hice), testified that neither Randolph, nor any one in his behalf, solicited his case." At another place

in the brief, the above statement was repeated in much the same language and the clients' names who, it is claimed, testified for respondent were named. The following is the statement; however, we have omitted the names of all but three of the witnesses: "The only witness who testified that the investigator solicited the client to employ Randolph was Hice. But * * * Carignan; * * * Tuggle; * * * Deason; * * * being all the other former clients, testified to the contrary." We shall examine the record and determine if the above statements in respondent's brief are true. Before taking up the Carignan, Tuggle, and Deason cases, we shall review the cases of Donnelly, Admr., Brown, et al. vs. A., T. & S. F. Ry. Co., and William R. Bouse vs. A., T. & S. F. Ry. Co. The Brown case was a suit by Mrs. Pauline V. Brown to recover damages for the death of her husband. In November, 1944, an explosion following a derailment of a train at Tolar, New Mexico, caused the husband's death. A proposed settlement of $6,500 in a court in New Mexico was not approved by the court. Thereafter, a cousin of Mrs. Brown, who happened to be C. C. (Cliff) Jennings, referred Mrs. Brown to respondent Randolph at Kansas City, Missouri. In fact, she rode to Kansas City with Jennings. Respondent was employed and thereafter the case was settled for $17,500. The check from the railroad was made payable to Mrs. Brown and Randolph. Respondent had a contract with Mrs. Brown for a 40% fee but by an interlineation in the contract, it was provided that if the case were settled, the fee would be only 26⅔%. A pencil notation at the bottom of the contract stated, "Fee of 26⅔% only if she hires case investigated at her cost. Says may have her cousin do this." Of the $17,500, Randolph retained $4,617.67 as a fee plus $183.75 for expenses. Randolph gave Mrs. Brown a check for $12,698.58, then took her to the Commerce Trust Company and had her cash her check. Two cashier's checks were issued against that sum, one to Pauline

V. Brown for $10,389.75, and one to C. C. Jennings for $2,308.83 which was 13⅓% of the amount of the net settlement. Randolph's share was 26⅔%, making a total of 40% in fees.

Let us look at the Bouse case. Bouse was injured while at work for the Santa Fe Railroad in New Mexico. Respondent was his attorney. The case was settled for $13,500. An amount of $123.68 was deducted for expenses; the net was $13,376.-32. Attorney fee to respondent of 26⅔% was $3,567.02. $300 was deducted for a loan. The balance to Bouse was $9,509.30. Bouse was taken to the Commerce Trust Company where he cashed his check. Two cashier's checks were then purchased, one to Bouse for $8,025.79, and one payable to J. N. Fenn, the alleged investigator, for $1,483.51.

Respondent's contention as to these and other cases is that the client employed the investigator and paid for the services rendered which usually was one half as much as the attorney's fee. The record does not sustain respondent's contention. Bouse's deposition was taken on April 28, 1955, at Albuquerque, New Mexico, concerning a contract with Fenn. Bouse stated therein:

"Q. Did you employ Mr. Fenn? A. No, sir.

"Q. In any capacity? A. No, sir.

"Q. For what reason did Mr. Fenn receive approximately eighteen hundred dollars of your settlement? A. He afterwards came to me and asked me if I wanted him to investigate a case for me to get depositions, he said, which I would need. I told him if he could do this work that it would be all right. That if he wanted to get them it would be fine, but I didn't know at the time that I was going to have to pay him. You know I thought he would do this for free gratis. I later found out I had to pay him for this work."

Bouse stated in his deposition that L. A. Stevenson recommended Randolph as an attorney. At another place in his deposition, Bouse stated that a man named Bryant referred him to Randolph. Bouse was asked how he met Fenn. Note what he said:

"Q. Mr. Fenn contacted you and stated to you that he was an investigator, is that correct? A. No, he was sent to me. This boy told me he said that he could do this kind of work and—

"Q. Who sent him to you? A. We met one day down at the drug store is the way it happened. He asked me how I was getting along, I told him I wasn't doing any good. He asked me if I had anybody doing the investigation for me. This L. A. Stevenson told me the boy would be very good, he recommended. He did them for him and I thought he did the work for free.

"Q. Do you know of anyone that Mr. Fenn contacted in regard to your case, Mr. Bouse? A. No, I don't know of anyone."

Respondent contends that he advised his clients to hire investigators in New Mexico because if he made the trip to New Mexico, it would take too much time and require greater expense. The record in the Bouse case shows that Randolph was present in Clovis, New Mexico, on December 17 and 18, 1947, and took depositions in the case. On September 14, 1948, a deposition was taken in Kansas City, Missouri. The record further shows that Fenn did very little work for the fee he received. In fact, Bouse could have obtained statements of witnesses for Randolph as well as Fenn. Mr. Bouse stated in his deposition he knew of no one Fenn had contacted in his behalf. Further on in the deposition, Bouse gave the following evidence:

"Q. What did Mr. Fenn state to you he had done to earn eighteen hun-

dred dollars? A. I never contacted Mr. Fenn whatsoever.

"Q. Did it seem normal to you to take eighteen hundred dollars of your money and give it to Norman Fenn? A. Well, it seems to me like it is a little high.

"Q. It is a little high for, even if he had done something, isn't it Mr. Bouse? A. It seems to me like it might be a little high price there. Here is the thing about it, in a deal like that I don't guess I was in any position to argue the question."

Bouse further stated that Randolph took additional statements from witnesses Bouse had suggested to him; that he had given these same names to Fenn. When the settlement was made, respondent went with Bouse to the Commerce Trust Company and had the bank issue a draft made payable to Fenn which was mailed to Fenn.

Francis P. Tuggle, an employee of the M. K. T. Railroad Company, was injured in June, 1946. At that time, he lived in New Franklin, Missouri, where he was injured. He testified that he had never heard of Randolph until James R. Smith came to see him at his home. Tuggle stated that the following occurred during this visit:

"A. Well, after he was in the house awhile he wanted to know how I was getting along, and I told him there had been a man or two from the Brotherhood of Railroad Trainmen from St. Louis, and they had been there from Chicago, and there had been men from all over the country after I got back from the hospital, but I told him that I wasn't interested in suing the railroad company, that what I wanted was not to lose my seniority and to go back to work.

"Q. Was he talking to you about suing the railroad company? A. Well, he mentioned that if I had any difficulties that he might be in a position to help me out.

"Q. How could he help you out? A. By getting Randolph.

"Q. That, I think you told me, was the first you ever knew of Randolph? A. Yes, sir.

"Q. Did he subsequently take you to Kansas City? A. When I made up my mind to come, yes, he brought me to Kansas City after I wrote the letter.

"Q. On that, now, did he tell you you would have to write a letter to Randolph? A. Yes.

"Q. Just tell the Committee in your own words what he said about that. A. He said I would have to write to Randolph to get an appointment when would be a good time that he could see me and discuss the case with me.

"Q. Is that the reason you wrote the letter, because Smith told you you would have to? A. That is right. I asked him then why I couldn't just go on up. He said I would have to write a letter, so I wrote it.

"Q. Then Randolph did write and make an appointment? A. That is right.

"Q. Now, did Smith go with you to Kansas City? A. That is right."

Further evidence given by Tuggle was to this effect:

"Q. Did you hire James R. Smith to do any thing for you on that day? A. Absolutely not, not that day or any other day."

When Tuggle was asked if Randolph recommended Smith to do some investigating for him, Tuggle replied, "When he stated the contract that he was to get 50 percent of my final settlement from the railroad company if he done the investigation, but he said he would make it a little lighter on me if we done our own investigating, like if we wanted to find this thing or the other down at New Franklin, if I

was able to go—well, he said, 'Mr. Smith was your neighbor, he could possibly do that if you wasn't able to get out of the house.' "

Then followed this testimony:

"Q. But he said he would investigate it? A. That is right.

"Q. You didn't contract with Smith? A. No.

"Q. You just signed a 50 percent contract? A. That is correct."

The case was settled for $15,000. The railroad's check in settlement was for $14,-350, showing a refund from Tuggle to the Retirement Board in the sum of $650. Of the amount of the settlement check, Tuggle received a check on the Commerce Trust Company signed by Randolph for $8,532.61. This check was cashed at the Commerce Trust Company; then two cashier's checks were issued, one to Tuggle for $6,696.69, and one to James R. Smith for $1,835.92. The balance went to Randolph for expenses and attorney's fee.

The contract for employment in this case provided for a fee of 50%. An interlineation in ink read "provided if settled before trial fee to be 37½%." Then a pencil notation appeared at the bottom of the contract which read "37½% my fee if he has case investigated by special investigator at his expense otherwise 50%." The contract in question is a typical example of most of the contracts in the cases investigated by the Advisory Committee. The interlineation in the contract shows that a different ink was used from that used in the body of the contract. Furthermore, in practically all of those contracts the provision as to the investigator was made in pencil at the bottom of the paper and is barely legible.

The evidence in this (the Tuggle) case shows beyond a doubt that Smith was responsible for Randolph's employment; further, that the fee paid to Smith was his reward for bringing the case to respondent.

Smith did very little, if any, work on the case. Respondent testified that Smith made the investigation for Tuggle and that Tuggle paid for the investigation. When asked about Tuggle's evidence, respondent stated that Tuggle was "a little impetuous." Respondent further testified that Tuggle had told him after the Advisory Committee began the present investigation that "You don't have anything to worry about from the Bar Committee as far as my case was concerned."

Martin Carignan, living at Boonville, Missouri, was an employee of the M. K. T. Railroad Company. He was injured on June 27, 1946, at Fort Scott, Kansas. Respondent testified he was employed in this case by Carignan; that Carignan wrote a letter to respondent in August, 1947, to the effect that on the recommendation of J. R. Smith he desired to employ respondent. The case was settled for $27,000. Deductions for loans, expenses and a sum of $520 advanced by the Retirement Board were made. Respondent received a fee of 30% amounting to $7,978.30 based on the net settlement of $26,594.36 after Randolph's expenses were deducted. Carignan's check was for $17,659.44 which was cashed and two cashier's checks issued: one to J. R. Smith from the Commerce Trust Company for $2,659.44 which was 10% of the net settlement; the other to Carignan for $15,000. The contract in this case was similar to the Tuggle contract, including the ink and pencil notations. However, the former was a 50% contract while the Carignan contract provided for a 40% attorney's fee. In the Carignan contract, it was provided that in case of a settlement before trial, the attorney's fee would be only 30%. We quote a portion of Carignan's testimony to demonstrate how he happened to employ respondent:

"Q. Tell the Committee just who this James R. Smith is, Martin. A. Well, of course to tell about that I would have to go back to Pat Tuggle.

Tuggle was a member of the lodge there.

"Q. That was your Brotherhood? A. Of the Brotherhood, and as Secretary and Treasurer of the lodge, of course I was in contact with Pat Tuggle, and Pat had an injury sometime after I did, and I did not hire any lawyer, attorney, I attempted to talk to the railroad company and sort of reach an understanding or agreement with them, and Pat first came over to my home quite a bit and told me that he had contacted a fellow by the name of Smith. I didn't know the man. And that he had through Smith hired a lawyer here in Kansas City, Mr. Randolph.

"The Chairman: C. A. Randolph?

"The Witness: C. A. Randolph. He suggested to me that I do the same thing, that we would both be together in the cases, in other words. Of course, I didn't know Smith, like I say. Mr. Smith came to the house one afternoon and I was in the back yard, and introduced himself and told me who he was, told me about Pat and told me about his injury. He had been injured at some previous time on the railroad.

\*   \*   \*   \*   \*   \*

"Mr. Hemker: But he came to your yard?

"The Witness: Yes. So he told me of his experiences with Mr. Randolph, and he told me that the only way I could contact Mr. Randolph was to write him, which I did. I wrote Mr. Randolph a letter."

Later, Smith took Carignan to Kansas City where Carignan saw Randolph. Carignan rode back to Boonville with Smith. Carignan testified that the contract he signed with Randolph had no pencil notations on it at the time of signing. As to employing Smith to investigate the case, Carignan testified:

"Q. Did he tell you that you would have to contract with Smith to investigate your case? A. No. sir, Mr. Randolph didn't mention Mr. Smith to me, or anything else in my case.

"Q. Did he tell you that Smith was an investigator that you could hire? A. No, sir.

"Q. Now, Mr. Carignan, to keep this in order, did you ever at any time hire James R. Smith to do any work in your case of any kind? A. No, sir.

"Q. Did you ever tell him that you would pay him anything? A. No, sir.

"Q. At any time? A. At any time, I did not.

"Q. Did you ever pay him anything that you ever knew about? A. No, sir."

Carignan stated that Smith, to his knowledge, did not aid in the investigation of the case. With reference to the payment to Smith, Carignan testified:

"Q. That is a photostatic copy of a Commerce Trust cashier's check No. 799353 payable to James R. Smith in an amount of $2,659.44, dated November 9, 1948, the date of your settlement. A. That is right.

"Q. Did you ever know that amount was being paid to James R. Smith, Martin? A. Not until you showed it to me.

"Q. Did you mail anything to James R. Smith the date of your settlement? A. No, sir.

"Q. From Kansas City? A. No, sir."

The record shows that one Carl V. Deason while working for the Kansas City Terminal was injured on February 9, 1946. Deason testified that on February 19, 1946, he signed a contract whereby he employed Randolph as his attorney to handle the case. Deason testified that he employed Randolph

through a friend; that he called Randolph and later went to his office and signed a contract; that O. C. Brown came to him after Randolph had been employed stating that he represented a Minneapolis lawyer; that Brown was at his place about thirty minutes and he, Deason, told him he had employed Randolph. On cross-examination, he was asked, "I am not asking you for reasons. I am asking you for facts. Now, did anybody come to you prior to the day that you went up to Mr. Randolph's office and say to go up and get Mr. Randolph or go up and hire him, he was a good lawyer, or anything like that?" Deason replied, "Yes, he did. He recommended, Brown recommended Mr. Randolph but understand I had already cut him off when he said he represented the Minneapolis lawyers because I told him I only want one lawyer and I want a good one and I have already talked to him." Deason stated that he never again saw Brown; that Brown did not do anything for him in the case; that Deason and his son and Randolph did all the investigating that was done in the case. The contract of employment provided a 40% fee, and by interlineation, in a different color of ink from that of the body of the contract, it was stated that "provided if case settled before trial fee to be 9/15 of settlement" and in pencil at the bottom of the contract appeared the notation "This on basis he hires case investigated at his expense." Deason testified that the interlineation and the pencil notation were not on the contract when it was signed; that his contract with Randolph was on a 60–40 basis. He further testified that he was well satisfied with Randolph's work and that he, Deason, received his 60% of the amount of the settlement which, after deductions for expenses, was $11,249.20. However, the record shows that O. C. Brown received $2,533.33 in this case; Randolph's fee was $5,066.67. Note that Brown's fee was one half the amount of Randolph's fee.

Deason had signed an affidavit which had been prepared by Randolph in which it was stated that he had agreed with Ran-

dolph to employ an investigator and that Brown did investigate the case; that Brown and Deason had worked together on the case. The affidavit further recited that Deason paid for two drafts "with the check Mr. Randolph gave me." Deason testified that after the investigation was commenced Randolph came to see him and stated that the "Bar Association was practically persecuting him on account of getting so many of these cases, and I really felt sorry for him because he was in bad shape"; that Randolph told him he wanted to make an investigator out of Brown "and I asked him who Brown was, I didn't even remember him"; that his (Deason's) eyes were bad when he signed the affidavit which Randolph prepared and which was brought to him to sign by Yearsley. Deason further testified that afterward, when he saw a copy of the affidavit, he called Randolph and told him there were statements in the affidavit that were not true. He stated that all of the matters with reference to Brown's being an investigator and being paid therefor, as stated in the affidavit, were not the truth; that he never in his life was in the Commerce Trust Company's place of business and knew nothing of a cashier's check to Brown until the present investigation was under way. With reference to knowing what was in the affidavit, Deason, on cross-examination, gave the following testimony:

"Q. Did you know anything that was in the statement? A. No, I couldn't read them.

"Q. You don't know a thing about what is in the statement? A. At that time I didn't.

"Q. Do you know now? A. Why, yes, as soon as I got a copy of them I called him up and told him he had better change them.

"Q. As soon as you got a copy of them? A. Yes.

"Q. When was that? A. About three or four months afterwards.

"Q. And you called Randolph up and told him to change them? A. Yes, I sure did."

This witness was friendly to Randolph but his version of what occurred with reference to Brown's activities was quite different from Randolph's version. According to Deason, he saw Brown only once and that was when Brown tried to solicit the case for a Minneapolis lawyer; that when told that Deason had employed Randolph, Brown gave Randolph a boost. According to Deason, Brown did nothing except to try to solicit the case and for that he received a part of the fee of 40% mentioned in the contract.

We could go on and on discussing other cases. However, we deem that to be unnecessary. A number of cases, among which was the Bouse case discussed supra, originated in New Mexico where Fenn seems to have been very active. Fenn had been a part of McDonald's organization and was well schooled in the art of getting cases. Instead of reviewing other cases in which Fenn was paid, we shall quote a portion of the Commissioner's report which shows how minutely the Commissioner examined the record and the thorough consideration he gave to the case. The findings of the Commissioner are fully supported by the evidence. We now quote from the report: "To support the Commissioner's view that Fenn was instrumental in having persons in New Mexico employ Respondent, the employment letters received by Respondent from these prospective clients have a great deal in common. Exs. 3–13 and 7–13 received in August, 1945, from Mrs. Francis and Lee Dunham, both begin, 'You have been recommended to me (By Some Friend) (Ex. 13–13) as a good personal injury lawyer.' ('Pursnal Ingery,' Ex. 13–13). There is a slight variation in Ex. 11–19, 'You have been recommended to me by several men who had good results from your services,' and in Ex. 5–11, from Bell, i. e.: 'You have been recommended to me by Mr. R. O. Mears as a good lawyer.'

In Ex. 17–14, from Donoho, Ex. 3–11a from Taylor and Ex. 10–25 from Beck, the letters begin, 'Since I have heard of you as an attorney handling personal injury cases,' and, 'I have heard of you as a great personal injury attorney,' and, 'Having heard of you through some of the many cases you so ably represented down in this part of the Country.' While anyone of these individuals might have written such a letter to Respondent, it seems apparent, in placing them side by side, that the similarities could hardly be coincidental. In view of the evidence that Fenn was in contact with these people in many cases, the Commissioner believes that Fenn inspired these letters. In fact, it seems to be admitted that he wrote Taylor's letter. Respondent points out that there is no significance to Fenn's having written Taylor of employment to Respondent, that Taylor could have gotten anyone to do that. But he didn't. Fenn did it.

"Respondent contends he did not suspect that some of the employment letters were written by Fenn.

"The Commissioner does not believe that, in view of Respondent having had more occasion to be familiar with Fenn's handwriting than with that of any of his clients."

In many other cases, the letters to respondent show that the prospective clients were prompted or advised to write Randolph. Respondent testified that generally he would agree with the client for a certain fee, then he would discuss the question of investigating the case, and that the client could if he wished pay for the investigation. Note, however, that the respondent's fee actually collected plus the investigator's fee, as a rule, amounted to the highest per cent mentioned in the contract. The client had nothing to do with setting the pay for an investigator. In many instances, the client did not know that an investigator was to be paid until the case was settled and even then some clients did not discover such fact. The Commis-

sioner found that the fees paid were all out of proportion to the amount of work performed by these so-called investigators. The unvarnished truth is that these investigators, as the Commissioner found, were paid for soliciting cases. Very few clients, if any, ever received the benefit of the clause in the contract, "If case is settled before trial."

The evidence justifies a finding that Randolph's manner of operation was in substance as follows: After a person was injured, the so-called investigator would make contact with the injured person who would then be told of respondent's ability to deal with F.E.L.A. cases; that in order to employ respondent, the injured person was told he must write a letter to respondent about the case and of the desire to employ respondent. In some instances, the so-called investigator would not even be in the picture until after a contract of employment was signed with respondent. Often, the investigator, either at the suggestion of respondent or sometimes through the investigator's own approach, would contact the injured person and would do some investigation work on the case. In very few cases, did the injured person know at the time the contract of employment was signed that the alleged investigator's fee and the lawyer's fee together would equal the full amount of the highest stipulated per cent mentioned in the contract. For example, a contract which provided for an attorney's fee of 40% with an interlineation that the fee would be 26⅔% "if case is settled before trial" would be settled on the basis of 26⅔% to respondent and 13⅓% to the so-called investigator or a total of 40%. Respondent would take 26⅔% and give the client a check for the balance. Then, respondent would take the client to the Commerce Trust Company, have him cash respondent's check to the client, and with that sum purchase two cashier's checks, one payable to the client and the other to the investigator for 13⅓% of the amount of the settlement. We note that respondent was very careful to see that this check or

draft would be sent to the investigator. In some cases, the check to the investigator was mailed from respondent's office. The pencil notation on these contracts concerning the client's employing his own investigator is inconsistent with the provision of the interlineation that a lesser fee would be charged "if case is settled before trial." It is our opinion that the interlineation and the pencil notation were a part of the scheme to cover up the real situation. So, too, were the transactions at the bank. Furthermore, we call attention to the fact that in practically all of these cases, the client was required to write a letter to Randolph. That same practice was followed by McDonald. (See Randolph's evidence supra.) The activities of respondent amounted to nothing more or less than plain "ambulance chasing" through so-called investigators who in fact were solicitors.

The charge that respondent divided his fees with lay solicitors was established by the evidence beyond a doubt; further, that respondent followed a scheme to conceal the solicitation of cases was also well established. These practices continued up to the time the charges were filed.

The conduct of respondent and his attitude toward the members of the Advisory Committee and its investigation reflect guilt. The record shows that Mrs. Pauline V. Brown, whose case we discussed supra, was later married to M. B. Mayhon. After this investigation was begun and before the charges were filed, Randolph located Mrs. Mayhon in Black, Texas. Randolph wrote a letter in longhand to her, dated March 27, 1954, which began as follows: "Your name and address have been given me as being the former Mrs. Pauline V. Brown of Tolar, N. M." Further on in this letter, respondent wrote the following:

"Now the railroad and the Clovis lawyers are working with the Grievance Committee of the Missouri Bar trying to take away my license to practice law. They are trying to prove that I hired a 'runner' or 'runners' to get these cases for me and divided my

fees with persons who are not lawyers which is a violation of the lawyer's code of ethics and prohibited by law. Your case is only one of several cases I handled from New Mexico, mostly near Clovis, and they have obtained photographs of the settlement checks the co. gave in settlement of these cases and are going around to see all my former clients and pumping them for information, getting affidavits and statements from them, and getting them to go to somebody's office and having a stenographer or tape recorder out of sight taking down or recording the conversation. Has any one been around to see you about your case during the last few week? If so, who, when, and who did he say he was? What did he ask you and what did you tell him? Was it at your home or in some office? Did you sign anything and if so what was in the statement? Was it before a notary? Was the conversation taken down or recorded on a machine?

"If no one has talked to you, be on your guard. Sometimes they have some neighbor or friend engage you in a conversation about your case to see if they can get you to say something they can use. If anybody sees or calls you refuse to go any place to be interviewed where they may secretly take down or otherwise record the conversation. Make them come to your house. Just as soon as they start asking you questions about your case or your lawyer, whether over the phone or face to face, just cut them off short and say I was recommended to you by a client, you wrote me and later went to Kansas City and hired me, that I handled your case to your entire satisfaction and you regard this matter as entirely personal and of no concern to anyone else, and refuse to discuss the matter any further. They may try to arrange the conference by having some local lawyer, doctor, banker or friend call you. If you have used the services of any lawyer in your locality they may have him call or see you to get you to his office. They will stop at nothing. If they do, tell him the same thing."

There are four more pages of this letter wherein Mrs. Mayhon was informed the exact manner in which respondent claims the case was handled.

The following is a letter written on July 31, 1955:

"Dear Mrs. Mayhon:

"Since writing you on July 3, 1955, it now looks like I will not be able to get around to see you as I had hoped I could and my not be able to have anybody else see you personally. When you wrote me in April, 1954, answering my letter and said, 'I will be glad to help you in any way I can,' I knew you believed in me and really appreciated the fact that I got you a settlement almost three times as large as the claim agent offered you and the Clovis lawyers seemed to think was about the best you could do. As you probably surmise, the Clovis lawyers also are sore at me because I have been showing thém up in these cases and getting New Mexico people so much better settlements than they are able to get the people out there have learned it is very much to their advantage to pass those lawyers up for sombody who can and will make the railroads pay what their cases are worth, just as you found out in your case. So the New Mexico lawyers are joining hands with the Santa Fe and other railroads and with the Committee of the Missouri Bar in trying to take away my license to practice law, which is my means of livlihood for myself and family. Members of this Committee as well as both lawyers they have appointed to handle the case against me also represent railroads, although they deny this when they go around to see my clients. They and the claim agents are resorting to every imaginable underhanded trick and device in their efforts to mislead my clients and get them mad at me and the investigator in their case. As fast as I catch up with one set of lies they are tellin them I find they have started a lot of new ones. Now I hear they are telling them I have made millions of dollars by cheating my clients and that

I got rich off of them, and that I beat them out of a lot of money and they will get it back for them if they will only do and say as they ask, and tell them they might as well as all my other clients say I beat them and that their cases were not handled in the manner I say they were handled.

"So you will see that they are out to get me, whether by fair or foul means they don't care. You can readily see from all this that I have to turn to my clients whom I feel I have served well, who have in their power to help or hurt me, for a little honest and conscientious assistance. As I told you in my last letter, contrary to the story these people after me are putting out, I am getting a heartwarming response from my clients in their efforts to help me any way they can. They are glad to give me statements in their cases.

"I have gone through the file in your case, also canceled checks and the records of my bank, and I have drawn up a statement covering the highlights of the way your case was handled and investigated, and covering the matters discussed in our correspondence during the past year or more. It is in accordance with the facts and the records in my office and at the bank. To refresh your recollection on the things covered in the statement, after more than 10 years, I have had a number of papers photographed and enclose them. These include one letter from you and the last page of another letter showing that Cliff was helping to work your case up and advising you, my check to you with your endorsement, showing also my O.K. when I identified you at the bank in buying the two drafts with the check I gave you, also the two drafts issued by the bank, one to you for your 60% and the other to Cliff for his 13⅓%, the indorsements on the drafts. You will remember you signed an order to the bank *fro* these two drafts which is part of the bank's records. However I have made a typewritten copy which I also enclose which will refresh your memory on this. So you will know you were not beat out of anything, as these people are telling my clients, I have before me the #settlement statement I showed you at the time. It shows my expense was $183.75, which deducted from $17,500, left a net settlement of $17,316.25. my fee of 26⅔% was $4,617.67, which deducted from the net settlement left $12,698.58, the amount of my check to you.

"Will you please go before a notary and sign the original statement enclosed on the line marked with X in pencil and mail it to me in the enclosed stamped, addressed envelope, keeping the copy of the statement enclosed so you can refresh your memory at any time as to the facts and what you said? I don't know how far you will have to go to get to a notary or exactly what the notary fee will be, but I believe the bill enclosed will cover all this. If not, let me know. I noticed Friona was in Parmer County and put that county on the statement. I didn't know what county Black was in.

"Thanking you for your help and consideration in this matter, I am

"Yours very truly,
(typed) "C. A. Randolph,
712 Commerce Bldg.,
"Kansas City 6, Mo."

"P.S. You can keep these photostats of checks etc. too." (The body and signature of the letter were written on a typewriter but the postscript was written in longhand.)

A letter dated December 2, 1954, written in longhand by "Jap" Fenn from Portales, New Mexico, to respondent with reference to a statement made by respondent's former client Bouse contained the following information: "I called Bouse. He said that an attorney there, was the head of the N. Mexico Bar. Wanted to fly him to K.C. to say that you solicited his Case. He said he told him to go to hell. He said he told him he had nothing to say." The balance of the letter was in the same tone. It was not shown that respondent advised Bouse

to tell anyone asking about cases "to go to hell." However, did not respondent advise Mrs. Mayhon to tell anyone who made inquiry about her case about the same thing except in slightly more polite language?

Respondent's charge that the members of this Committee had entered into a conspiracy with the members of the Bar of New Mexico and railroad companies to have respondent's license revoked was not true and was uncalled for. We are of the opinion that the sole purpose of statements to that effect was to generate animosity in the minds of respondent's clients toward the investigation. It was this charge of respondent that prompted the remarks earlier in the opinion to the effect that the duties of the Committee are indeed unpleasant. It is respondent's position that he had grounds for making such charges because of what his former clients had told him. An examination of the letters written by respondent to Mrs. Mayhon, from which we quoted supra, shows that respondent was telling his former clients of an alleged conspiracy and not the clients telling respondent. Respondent and his so-called investigators were very active in getting statements from clients as to how they came to employ respondent. The statements often were prepared by respondent, making them consistent with the scheme to conceal the true basis on which the alleged investigators were paid. As to this, is it not reasonable to assume that the client would have sufficient recollection of how he came to employ respondent and whether the client employed an investigator? The client had only one such event as a serious injury and settlement of his case to remember while respondent dealt with numerous such cases. Furthermore, if there was nothing wrong with the manner in which the cases were obtained, what was respondent afraid of? Why all of the activity in preparing statements for the clients and reminding them just how their cases were handled?

Respondent had a perfect right to prepare his defense and to get statements from his former clients. However, respondent was not justified in telling his clients that the members of the Advisory Committee and the attorneys for that Committee were all employed by railroads; that they had entered into a conspiracy to revoke his license; that they lied, stooped to underhanded tricks, and employed foul means in getting evidence against respondent. The conduct of respondent in this regard, stating it mildly, was reprehensible.

It is true that railroads were complaining of Randolph's activities. It is also true that claim agents of the railroads, especially one named Hinkle, were active in the investigation of respondent. Respondent testified that Hinkle had been after him for some time; that Hinkle had an injured person sign a settlement for a very small sum; that respondent took the injured person's case, had the settlement set aside, and obtained a substantial sum for his client. Respondent stated that that case embittered Hinkle against respondent. In such cases, courts set aside the settlements obtained by claim agents. Certainly, such practices in obtaining settlements should not be condoned. However, granting all that to be true, respondent was not justified in accusing the members of the Advisory Committee or the attorneys representing the Committee of a conspiracy and gross misconduct.

In the brief filed in this court, it is stated, and in the oral argument it was asserted, that the Commissioner without cause disbelieved the evidence of respondent and believed the evidence of witnesses who had been discredited. The record supports a justification for disbelieving much of respondent's evidence. The evidence of respondent in many respects was contradicted by documentary evidence. In some instances, his evidence is unbelievable. For example, respondent testified he had no knowledge that after 1940 McDonald was soliciting cases. Not only that but respondent stated before the Commissioner that he did not know even then that McDonald's

cases which were referred to respondent had been solicited. Respondent testified before the Committee in the summer of 1946. In June of that year, he wrote a letter to McDonald to the effect that if the two cases then being offered were cases in which the Railroad Brotherhood had an interest, he would not want them. However, if the Brotherhood had no interest in the fee, then he would take the cases. The letter indicates that respondent was suspicious that McDonald was splitting fees with the Brotherhood. For the rule in Missouri governing the dealings of the Brotherhood with lawyers in personal injury cases, see Hulse v. Brotherhood of Railroad Trainmen, Mo., 340 S.W.2d 404. Respondent, even at the final hearing, claimed that he had no grounds to suspect that McDonald was soliciting cases until after the present charges were filed in 1956. The Commissioner did not believe that. Neither do we.

A number of witnesses, former clients of respondent, testified in support of respondent's theory that the clients employed the investigators and agreed with them for their pay; further, that the cases were not solicited for the respondent. A number of these witnesses had been interviewed by a representative of the Advisory Committee while the investigation was in progress. This representative of the Committee, a lawyer of good repute, testified at the hearing before the Commissioner. The evidence of the clients at the hearing was in some respects at variance with statements alleged to have been made earlier to the representative of the Committee. For example, W. W. Goodner, whose case was settled in 1952 for $43,150, testified that he wrote to Randolph about his case because he had heard of him through others who had been injured; that he employed Fenn as his investigator and paid him for his services; that while at Randolph's office, Randolph figured how much money had been advanced to him (by Randolph), also the expense of taking depositions, and "we figured up Norman Fenn's fee along with

that." The settlement sheet (Ex. 11-24) shows a deduction of $770 due for loans from the Railroad Retirement Board, various items such as loans and advances by Randolph (22 in number) for a total of $4,025, and respondent's attorney fee of $9,572.55. The sheet shows "net ck to Goodner" as $28,708.95. However, the paper does not make any reference to the fee to be paid to Fenn. This fee is shown by a cashier's check in the sum of $4,786.28, one half as much as the attorney fee. With Randolph's check for $28,708.95, two cashier's checks were purchased: one to Goodner for $23,922.67; and one to Fenn for the fee mentioned. So, Goodner was mistaken that Fenn's fee was figured in the settlement sheet. The representative of the Advisory Committee testified that Goodner told him that Fenn's fee was not more than $500.

O. V. Beck testified for respondent. According to his evidence, his case was settled about the same way as Goodner's; further, that he employed Fenn as the investigator. The representative of the Advisory Committee testified that Beck told him "that Fenn did not do anything in regard to his case" and that he knew of no cashier's check made payable to Fenn. The record shows that Fenn received a cashier's check for $2,075.19.

An examination of the evidence of the above two witnesses and others has convinced us that they were well coached by respondent and his investigators as to how their cases were handled. The letter to Mrs. Mayhon, supra, supports our conclusion.

Beck, in an affidavit written in longhand, minutely detailed the manner in which his case was handled by Randolph. An examination of this affidavit, along with the letters written by respondent to Mrs. Mayhon, indicates that it was dictated or prepared by respondent.

A number of witnesses, testifying in support of the charges, were to some extent

impeached and contradicted. In some of these instances, the statements of such witnesses made at the hearing before the Commissioner contradicted their statements made previously to an investigator for respondent. However, the documentary evidence supports the charges made and corroborates the evidence in support of the charges. The fact that in practically all of these cases the fee of the so-called investigator amounted to one half of the amount of the attorney's fee and the fact that respondent was very careful to see that the investigator was paid support the finding of the Commissioner that the cases were solicited and that the investigators were paid primarily for having the injured person employ respondent. In the case of In re Frankel, 20 N.J. 588, 120 A.2d 603, a disbarment proceeding, a similar question was before the court. The claim was there made that the investigator was paid a certain per cent of the amount the client received for investigating the case. We quote what the court there said as applicable to the case before us (120 A.2d loc. cit. 606): "This standard of remuneration does not comport with the hypothesis of investigational service, varying as it would in time and effort according to the exigencies of the particular case, but rather betokens a sharing of the earned net legal fee on a fixed percentage basis for bringing the case to Frankel. This is clear beyond peradventure. The method of compensation is a distinctive symbol of the latter; it is in its very nature repugnant to the theory of recompense for purely investigational endeavors."

An examination of the record in the case before us and the report of the Special Commissioner has led us to the conclusion that the Commissioner was extremely charitable in his findings of facts and in his recommendation as to the disciplinary action.

We apologize for the length of this opinion. Respondent's continued insistence all through the hearings that the charges against him were untrue and contentions made in his brief and by his counsel in oral argument that the evidence wholly failed to sustain the charges caused us to set out verbatim some of the evidence and occasioned our extensive discussion of what the record shows.

In view of the conclusions we have reached, it will not be necessary to pass on the exceptions of the Advisory Committee to the ruling of the Special Commissioner finding respondent not guilty of violating Rules 4.10 and 4.42. These charges involved advances of money made to clients pending settlements of their claims.

■ We now turn to a consideration of what disciplinary action should be taken in this case. The main purpose of a proceeding of this nature is to make an inquiry into the fitness of an attorney to continue in the practice of law. Its main objective is not to punish the attorney but the protection of the public and the maintenance of the integrity of the profession and of the courts. The subject has been considered so often that we deem it sufficient to make reference to a number of cases and authorities and so shall not discuss the subject at length. See In re Conner, 357 Mo. 270, 207 S.W.2d 492, loc. cit. 498, 499 (13) (14, 15); In re Speiser, Mo.App., 294 S.W. 2d 656, loc. cit. 665 (4, 5); In re McLendon, Mo., 337 S.W.2d 56, loc. cit. 61 (2); In re Moon, Mo., 310 S.W.2d 935, loc. cit. 938, 939 (3); In re Introcaso, 26 N.J. 353, 140 A.2d 70, loc. cit. 74 (2) (3); In re Frankel, 20 N.J. 588, 120 A.2d 603, loc. cit. 607 (4); Johnson v. State Bar of California, 10 Cal.2d 212, 73 P.2d 1191, loc. cit. 1194 (3, 4); In re Morrow, 214 Or. 250, 329 P.2d 482, loc. cit. 486 (2–4); In re Fisher, 15 Ill.2d 139, 153 N.E.2d 832, loc. cit. 840 (11–15); Memphis & Shelby County Bar Association v. Vick, 40 Tenn.App., 206, 290 S.W.2d 871, loc. cit. 875 (1); 7 C.J.S. Attorney and Client § 28, pp. 770–774.

■ Disbarring an attorney is a very serious matter. It brings disgrace upon

him and deprives him of the right to engage in work for which he has prepared himself through years of schooling. If the attorney has borne a good reputation, the disbarment results in besmirching his good name. These considerations must be taken into account. However, they cannot stand in the way in cases where the public interest requires disbarment. If a lawyer has so conducted himself that his continuance as a member of the Bar will adversely affect the public interest, his name should be removed from the membership rolls of the legal profession. In the case before us, we are dealing with an attorney who through a long number of years engaged in the practice of knowingly taking cases that were brought to his office by laymen and splitting fees with them on a percentage basis. The actual practice in its ultimate result was a solicitation of personal injury cases by laymen and a splitting of fees. In re Heirich, 10 Ill.2d 357, 140 N.E.2d 825, 67 A.L.R.2d 827, Annotations, p. 882, § 8, and p. 898, § 9. The smoke screen thrown about the transactions to obscure the true facts becomes transparent upon an examination of the record before us. Further consideration must be given to the conduct of respondent during the time his activities were being investigated. See In re Heirich, 10 Ill.2d 357, 140 N.E.2d 825, 67 A.L.R.2d 827, Annotations, p. 927, § 19. The coaching of his former clients as to what to say to any person making inquiry about respondent, as revealed in the letters to Mrs. Mayhon, quoted supra; the charges made against the members of the Advisory Committee and its attorneys; respondent's continued denial that he did not know and had no grounds to suspect that McDonald was soliciting cases when, in fact, respondent had actual knowledge of McDonald's practice—are all facts to be taken into consideration in what disciplinary action should be taken. As we have said supra, the Special Commissioner was very charitable to respondent in the findings of facts as well as in his recommendation that respondent be suspended for one year. In the case of In re Frankel, supra, the New Jersey Supreme Court had before it a case somewhat similar to that before us. For three years Frankel had been soliciting cases through a layman and splitting fees with him. The court suspended Frankel for three years. It was stated in the opinion that, due to the fact that it was the first case under the then rules of the court, disbarment would not be ordered. Two of the judges dissented and were of the opinion that disbarment should be the order. The practice of soliciting cases and splitting fees with laymen through whom cases were obtained has long been condemned. In re Gallant, 231 Mo.App. 150, 95 S.W.2d 1249; State ex rel. Sorensen v. Goldman, 127 Neb. 340, 255 N.W. 32, loc. cit. 35, 36 (5); Howe v. State Bar of California, 212 Cal. 222, 298 P. 25, loc. cit. 28 (5) (6); People v. Gray, 52 Cal.App.2d 620, 127 P.2d 72, loc. cit. 90 (22); 7 C.J.S. Attorney and Client § 23h, pp. 758, 759, and cases cited under notes 50, 51, 52, and 53.

In the principal opinion, as well as in the dissenting opinion, in the Frankel case, supra, the court reviewed at length authorities on the evil of "ambulance chasing." It would serve no useful purpose to review the subject here. The practice has been condemned for many years by this court in many cases. Ambulance chasing and splitting fees with laymen lead to many evils. Such practices are unfair to the other members of the Bar. To meet the competition occasioned by these practices, some lawyers engage in such practices who otherwise would not think of doing so. Corruption, such as bringing forth spurious cases and perjury, often result from the unethical practices which tend to degrade the legal profession and breed disrespect for the courts. In general, solicitation of cases and splitting fees with laymen are in all respects detrimental to the public interest.

We would be derelict in our duty if our order would do less than disbar respondent from the practice of law. His long continued practice of the evils described

deserves nothing less. 5 Am.Jur. 425, 426, Sec. 274.

It is the order of this court that C. A. Randolph be disbarred from the practice of law and that his name be ordered stricken from the roll of attorneys in the courts of this state. The costs of this proceeding are taxed against respondent.

It is so ordered.

All concur except LEEDY, J., not sitting.