*296 ORIGINAL DISCIPLINARY PROCEEDING
The chief disciplinary counsel’s office was represented by Chief Disciplinary Counsel Alan D, Pratzel and Sharon K. Weedin and Sam S. Phillips of his office in Jefferson City, (573) 635-7400, and special regional representative Kevin J. Odrowski, an attorney in Kansas City, (816) 931-4408.
Krigel was represented by Jacqueline A. Cook of Franke Schultz & Mullen PC in Kansas City, (816) 421-7100, and David J. Achtenberg, an attorney in Kansas City, (816)523-6834.
Various law professors and practitioners of professional responsibility and family law, who filed a brief as a friend of the Court, were represented by Barbara A. Glesner Fines of the University of Missouri-Kansas City School of Law in Kansas City, (816) 235-2380.
GEORGE W. DRAPER III, JUDGE
The Office of Chief Disciplinary Counsel (hereinafter, “OCDC”) seeks to discipline Sanford P. Krigel’s (hereinafter, “Krigel”) law'license for alleged multiple violations of the Rules of Professional Conduct. This Court finds that Krigel committed violations of Rule 4-3.3(a)(3) (knowingly offering false evidence),' Rule 4-4.1(a) (false statement of material fact), Rule 4-4.4(a) (using means to improperly burden or delay a third person), and Rule 4-8.4(d) (conduct prejudicial to the administration of justice). Krigel is suspended from the practice of law for six months, with execution of such suspension stayed, subject to Krigel’s completion of a two-year term of probation in accordance with conditions imposed by this Court.
Factual and Procedural History
Krigel was admitted to The Missouri Bar in September 1976. He has no disci *297 plinary history, and his license is in good standing. He is an owner, founder, and managing partner- of Krigel & Krigel. Krigel has substantial experience in the practice of law and specializes in adoption law.
This matter arises from Krigel’s representation of an unmarried, pregnant, eighteen year old woman (hereinafter, “Birth Mother”) in 2009. Birth Mother became unexpectedly pregnant while in a monogamous relationship with her boyfriend (hereinafter, “Birth Father”). Birth Mother and Birth Father discussed various options for dealing with this pregnancy. Ultimately, they made no decision other than to hide the pregnancy from their parents until Birth Mother was approximately eight months pregnant.
Birth Mother and Birth Father both resided with them respective families. On March 5, 2010, Birth Mother, Birth Father, and both sets of their parents came together to discuss the pregnancy. During this discussion, Birth Father declared he wanted to raise the, child at his home with his parents and that he did not want to place the child up. for adoption. This discussion precipitated a sharp decline in the relationship between the birth parents. Birth Mother and Birth Father ended their relationship, and Birth Mother’s parents initiated steps to prevent Birth Father from having further contact .with Birth Mother.
Birth Father retained Jeff Zimmerman (hereinafter, “Zimmerman”), an attorney, in connection with the pregnancy. ’ Meanwhile, Birth Mother contacted Hillary Merryfield[1] (hereinafter, “Merryfield”), seeking information regarding options available to her and requesting'an attorney referral. Merryfield.referred Birth Mother to Krigel; Merryfield and Krigel had worked together on adoption matters for approximately twenty years.
Krigel met with Birth Mother and her parents on March 11, 2010. Birth Mother and her parents advised Krigel of the background, pregnancy, and relationship with Birth Father and its deterioration earlier in the month. Birth Mother indicated that originally she and -Birth' Father discussed raising the child together, but since the deterioration of their relationship, she believed that it would be best for the child to be adopted by a family. Birth Mother provided' Krigel with her April due date as well as Birth Father’s name and residence. There was no doubt in Birth Mother’s mind as to the actual paternity of the child. " Krigel was told that Birth Mother and Birth Father were to communicate only through attorneys. Further, Krigel was informed that "Birth Father would not consent to an adoption. •
..Krigel explained to Birth Mother, her rights undér Missouri law and the rights of a biological father to assert paternity. Krigel described the relevant time frames in which a biological father had to assert his parental rights to have his consent required for an adoption. Ultimately, the family retained Krigel to assist. ■ Birth Mother, in terminating her parental rights in anticipation of a subsequent adoption proceeding.
Krigel employed a “passive, strategy”, in his representation of Birth Mother. Accordingly, Krigel and Birth Mother would “actively do nothing” to communicate with Birth Father or his counsel; they-would not advise Birth Father or his counsel of *298 the adoption plans, the birth of the child, and the instigation of any legal proceedings.
On March 19, 2010, Krigel received a telephone call from. Zimmerman. Krigel knew Zimmerman practiced law primarily in Kansas, and he did not believe Zimmerman typically handled adoption or paternity matters. Krigel represented to Zimmerman that the child would not be adopted without Birth Father’s consent. Zimmerman stated that he believed Birth Mother and Birth Father needed to be counseled regarding their situation without the presence of their parents. Krigel suggested Birth Mother and Birth Father meet with Merryfield, knowing Birth Mother was working with Merryfield already and pursuing an adoption for the child. Subsequently, Zimmerman contacted Merryfield to obtain an appointment for Birth Mother and Birth Father to obtain counseling and attempt to reconcile a unified course of action for the child.
On March 22, 2010, Birth Mother and Birth Father met with Merryfield. At the meeting, Birth Father stated he would not consent to an adoption, and he wanted to raise the child, preferably with Birth Mother. After the meeting, Merryfield contacted Krigel and informed him that Birth Father did not want to consent to an adoption. However, Merryfield thought that Birth Father probably would not contest the adoption because she characterized him as quiet, sad, and passive.
Birth Mother contacted Birth Father in late March. Birth Mother informed him that her expected due date had changed from early April to early May. This statement was intended to deceive Birth Father of the real due date.
The child was born. Neither Birth Father nor Zimmerman was informed of the child’s birth. Birth Father’s name was not indicated on the birth certificate.
On April 6, 2010, there was a “Consent to Terminate Parental Rights” hearing in Jackson County, Missouri, allowing Birth Mother to terminate her parental rights in preparation for adoption proceedings. Neither Birth Father nor Zimmerman was aware of the hearing, and accordingly, they did not appear. In response to a question by Krigel, Birth Mother agreed that Birth Father “had been consulted at length about the matter.” Birth Mother also agreed when Krigel asked “even though you’ve talked to him and his family at some length, he has not stepped forward since the birth of the child claiming any rights to the child.” Birth Mother’s parental rights were terminated. Immediately thereafter, a “Motion to Transfer Custody and for Adoption” was heard. The custody of the child was transferred to the prospective adoptive parents.
At some point between May 3 and May 12, 2010, Birth Father learned of the child’s birth and the deception regarding Birth Mother’s expected due date. Birth Father then placed his name on the Putative Father Registry. Later in May, Birth Father learned of the adoption proceedings, and he moved to intervene. On May 6, 2011, the trial court entered its judgment in the adoption proceedings, denying the petition of the adoptive parents and awarding legal and physical custody of the child to Birth Father.
The OCDC filed an information against Krigel in February 2014. Krigel did not admit to any violation of the Rules of Professional Conduct that were alleged in the information. In December 2014, the Disciplinary Hearing Panel (hereinafter, “DHP”) conducted an evidentiary hearing.

The Disciplinary Hearing Panel

Following its hearing, the DHP found Krigel violated four rules of professional *299 conduct: Rule 4 — 3.3(a)(3); Rule 4-4.1(a); Rule 4-4.4(a); and Rule 4~8.4(d). The DHP did not make any findings regarding aggravating or mitigating factors. The DHP recommended Krigel be suspended indefinitely from the practice of law with no leave to apply for reinstatement for six months.
The OCDC accepted the DHP’s recommendation. However, Krigel rejected the DHP’s recommendation, believing that no sanction for his actions should be imposed. Krigel asks this Court to dismiss the information against him. Because Krigel rejected the DHP’s recommendation, this Court must determine the appropriate discipline. Rule 5.19(d)(3).
Standard of Review
. The DHP’s findings of fact and conclusions of law are advisory. In re Belz, 258 S.W.3d 38, 41 (Mo. banc 2008). “This Court [in a disciplinary proceeding] reviews the evidence de novo, independently determining all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law.” In re Snyder, 35 S.W.3d 380, 382 (Mo. banc 2000). “Professional misconduct must be proven by a preponderance of the evidence before discipline will be imposed.” In re Madison, 282 S.W.3d 350, 352 (Mo. banc 2009) (quoting In re Crews, 159 S.W.3d 355, 358 (Mo. banc 2005)).
Krigel’s Conduct
Based on the record before this Court, Krigel committed multiple violations of the Rules of Professional Conduct. This Court finds Krigel to have violated the following rules:

Violation of Rule 1-3.3 (a) (8)

Rule 4-3.3(a)(3) requires a lawyer shall not knowing “offer evidence that the lawyer knows to be false _” Krigel’s questioning of Birth Mother at that hearing was designed to mislead the trial court as to the actual circumstances between Birth Mother and Birth Father.
Prior to the April 2010 hearing, Krigel and Birth-Mother discussed his intended examination of her. Krigel’s questioning of Birth Mother at that hearing, while technically truthful, omitted, essential information. While representing there was a belief Birth Father may not actively pursue opposition to the adoption, there was no indication that Bjrth Father stated his acquiescence to adoption. Krigel knew Birth Father was .uninformed about the child’s birth, his name was omitted from the child’s birth certificate, and his attorney had contacted Krigel to work cooperatively. on the child’s future placement and prevent adoption. Birth Mother’s testimony further indicated that Birth Father was able to be in continuous communication with her, which Krigel knew was untrue. Birth Mother also stated that Birth Father had not visited the hospital after the birth, which was true, but Krigel'failed to clarify that Birth Fathei* was not informed of the time or place of the child’s birth. Krigel’s representation to the trial court via his questioning, by permitting false and misleading testimony to bé presented, was designed to portray the false impression that Birth Father was not interested in the child or in asserting his parental rights.

Violation of Rule I-J/..l(d)

Rule 4-4.1(a) specifies that when representing a client, a lawyer shall not knowingly “make a false statement of material fact or law to a third person .... ” Krigel violated this rule in his communication with Zimmerman, indicating the child would not be adopted without Birth .Father’s consent. Further, at the time Kri-gel spoke with Zimmerman, Krigel knew *300 that he advised Birth Mother not to communicate with Birth Father regarding any information about the child, including the child’s birth or subsequent adoption- proceedings.

Violation of Rule 4-r-4,4(a)

Rule 4-4.4(a) requires thát in representing a client, a lawyer “shall not use means that have no substantial purpose' other than to embarrass, delay, or burden a third person ....” By actively concealing factual information from Birth Father and his counsel so that his client’s position would prevail, Krigel violated this rule. Comment one to this rule provides, in pertinent part: “Responsibility to a client requires a lawyer^ to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons.”
Krigel advised Birth Mother and her family to have no contact with Birth Father and. to not divulge any information to Birth Father regarding the birth of their child. Krigel communicated with, Zimmerman, indicating that the child would not be adopted .without Birth Father’s consent. Further, Krigel advised Birth Mother and Birth Father to receive “counseling” from Merryfield, who was actively working with Birth Mother to place the child in an adoptive home., Despite actual knowledge that Birth Father wanted to raise the child, Krigel pursued a course of ..action that disregarded the parental rights of Birth Father and "the best interests of the child in remaining with a natural parent. Kri-gel’s actions served no substantial purpose other than to impair and, delay Birth Father’s assertion of his parental rights.

Violation, of Rule ⅛-84(&)

Rule 4-8.4(d) provides that it is professional misconduct 'for a lawyer to “engage in conduct that is prejudicial to the administration of justice_” ■ Krigel signed and submitted two documents to the trial court,- which hindered the administration of justice.
Krigel signed and submitted a “Petition to Approve, Consent, and Transfer of Custody” to the trial court, stating that Birth Mother did not know of any “other person not a party to these proceedings who has physical custody of the child or claims to have custody or visitation rights with respect to the child.” This was not a true statement in that Krigel knew the name, address, and attorney for Birth Father. Birth Father was not a party to the proceedings, but one who had a claim of child custody or visitation.
The opportunity for Birth Father to assert his pai’ental rights actively was thwarted by Krigel’s violation of this rule.
Discipline
This Court finds by a preponderance of the evidence that Krigel committed the foregoing rule violations, amounting to multiple acts of professional misconduct. Accordingly, this Court must determine the appropriate discipline to impose. “This Court relies on the ABA Standards when imposing sanctions to achieve the goals of attorney discipline.” In re Coleman, 295 S.W.3d 857, 869 (Mo. banc 2009).[2]

Factors Governing Discipline

This Court has the inherent authority to regulate the practice of law and administer attorney discipline. In re *301 Zink, 278 S.W.3d 166,169 (Mo. banc 2009). The purpose of imposing discipline, is not to punish the attorney but to protect the public and maintain the integrity of the legal profession. In re Stewart, 342 S.W.3d 307, 308 (Mo. banc 2011). “Those twin purposes may be achieved both directly, by removing a person from the practice of law, and indirectly, by imposing a sanction which serves to deter other members of the Bar from engaging in similar conduct.” In re Razanas, 96 S.W.3d 803, 807-08 (Mo. banc 2003).
It is this Court’s duty to determine what discipline is appropriate to im-; pose for these violations by reviewing similar past cases, the disciplinary rules, and the applicable ABA standards. Stewart, 342 S.W.3d at 310. This Court notes that generally when considering what sanction to impose, this Court considers four factors:
(a) the duty violated;
(b) the lawyer’s mental state; .
(c) the potential or actual injury caused by the lawyer’s misconduct; and
(d) the existence of aggravating or mitigating factors.
ABA Standard 3.0 (2013 Ed.) When this Court finds- an attorney has committed multiple acts of misconduct, “the ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among the violations.” Coleman, 295 S.W.3d at 870 (internal citations omitted).

Appropriate Discipline

This Court determined Krigel committed professional misconduct in violation of Rule 4-3.3(a)(3), Rule 4-4.1(a), Rule 4-4.4(a), and. Rule 4-8.4(d). Once misconduct is established, this.Court may consider aggravating and mitigating factors when deciding what sanction to impose.[3] ABA Standard 9.1, The record contains evidence of both factors. With respect to aggravating factors, Krigel committed multiple offenses and fails to grasp the severity of these charges. However, in mitigation, Krigel has been a practicing attorney for more than thirty years with no disciplinary history prior to this incident.
Krigel’s most egregious act of misconduct was lack of candor toward the tribunal." Generally, “when an attorney, with an intent to deceive the court, submits a false document, makes a false statement, or withholds material information, disbarment is the appropriate sanction.” In re Caranchini, 956 S.W.2d 910, 919 (Mo. banc 1997); see also ABA Standard 6.H.
Disbarment is “reserved for clear cases of gross misconduct, those in which the attorney' is demonstrably unfit to continue in the profession.” In re Ver Dught, 825 S.W.2d 847, 851 (Mo. banc 1992) (suspending the attorney for his belief that the law- did not require him to disclose facts that -he believed were not material and no material fact was falsified). The dissent believes that Krigel should be disbarred from the practice of law, comparing Krigel’s conduct to that of the attorney in In re Oberhellmann, 873 S.W.2d 851 (Mo. banc 1994).- In Oberhellmann, the attorney’s misrepresentations were made in two separate and unrelated cases. Id. at 853.[4] In one case, the attorney affirmatively in *302 structed his client to perjure herself on the witness stand, and in the other case, the attorney forged his former legal associate’s signature on a document submitted to the court. Id. at 853 and 855. The analogy of Krigel’s conduct to Oberhellmann is inap-posite.
A lesser sanction of suspension may be appropriate in cases when “the attorney merely knows of the misrepresentation .... ” Caranchini, 956 S.W.2d at 919. “Suspension is appropriate only if a lawyer knows that a false statement is being submitted to a court and takes no remedial action.” Oberhellmann, 873 S.W.2d at 856. Turning to ABA Standards, this Court finds the appropriate recommended range of discipline to be reflected in ABA Standard 6.12.
Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

Id.

There must be significant discipline to maintain the public’s trust and protect the integrity of the legal system; accordingly, Krigel’s request that no sanction be imposed is not appropriate. Krigel’s conduct in this matter was not passive; he knew material information was withheld from the trial court, and he took no remedial action during any of the proceedings.
However, this is Krigel’s first disciplinary matter before this Court. “This Court adheres to a practice of applying progressive discipline when imposing sanctions on attorneys who commit misconduct.” In re Forck, 418 S.W.3d 437, 444 (Mo. banc 2014). Considering Krigel has never been disciplined by this Court and has specialized in this area of law for more than thirty years without complaint, disbarment is an inappropriate sanction.
In accord with the ABA Standards, this Court suspends Krigel from the practice of law, with execution of such suspension stayed, subject to Krigel’s completion of a two-year term of probation in accordance with conditions imposed by this Court. This sanction is designed to maintain the public’s trust, protect the integrity of the legal system, and is supported by prior disciplinary proceedings.' See Ver Dught, 825 S.W.2d at 850-51. Should Krigel not comply with this Court’s discipline by violating the terms of his probation, he may be subject to having his probation revoked or further discipline being imposed. Rule 5.225(f)(2).
Conclusion
Krigel is suspended from the practice of law for six months, with execution of such suspension stayed, subject to Krigel’s completion of a two-year term of probation in accordance with conditions imposed by this Court.
Stith and Russell, JJ., concur; Breckenridge, C. J., concurs in part and dissents in part in separate opinion filed; Fischer, J., dissents in separate opinion filed; Wilson and Teitelman, JJ., concur in opinion of Fischer, J.

, Merryfield is a licensed clinical social worker in both Missouri and Kansas. Merryfield operates a licensed child placement agency, Adoption Option Inc., which counsels birth mothers and couples seeking adoption. Additionally, Merryfield works for Missouri and Kansas courts to provide home studies for prospective adoptive parents.

. This Court recognizes that tire AÉA Standards are used for guidance in imposing attorney discipline, and the most repent ABA Standards were published in 2013. See In re Ehler, 319 S.W,3d 442, 451 (Mo. banc 2010).

. The DHP did not address aggravating or mitigating factors in its decision,

. These misrepresentations were made in the United States District Court for the Eastern District of Missouri and the United States District Court for the Central District of Illinois. Id. at 853-54.