

# SUPREME COURT OF MISSOURI
## en banc

*Opinion issued December 10, 2024*

IN RE: TODD N. AGRON, )
)  No. SC100543
Respondent. )

## ORIGINAL DISCPLINARY PROCEEDING

In this original attorney disciplinary proceeding, Todd Agron stipulated to professional misconduct. The parties' only dispute is the appropriate discipline for Agron's ethical violations. Because Agron made payments to an illicit pay-per-lead referral service and knowingly made dishonest statements to those investigating his misconduct, this Court suspends Agron's license to practice law indefinitely with no leave to apply for reinstatement for 12 months.

## Factual Background and Procedural History

Agron was admitted to The Missouri Bar in 2004 and has no prior disciplinary history. For the first four years of his career, Agron was an assistant prosecutor in the Jackson County prosecutor's office. Afterward, Agron transitioned into private practice, focusing on personal injury cases. In October 2020, Agron entered into a business relationship with the Personal Injury Group d/b/a National Accident Consulting, LLC

("NAC"), which advertised itself as providing "referral services to personal injury attorneys specializing in automobile accidents." In other words, NAC referred individuals injured in automobile accidents to personal injury lawyers. NAC was not a qualified lawyer referral service nor registered with the Office of Chief Disciplinary Counsel ("OCDC") as required by the Missouri Rules of Professional Conduct. Agron paid NAC $500 per referral.

From October 2020 to April 2021, Agron paid a total of $77,000 to NAC for 154 referrals in 16 separate checks. During this time period, Agron did not make any reasonable efforts to ensure NAC was a properly registered or qualified referral service.

In October 2020, Agron wrote a $500 check to R.W., who presented himself as an NAC employee, in exchange for a client referral. Four months later, R.W. solicited a potential personal injury client for Agron. R.W. unlawfully obtained personal and private information about the potential client. Agron did not investigate whether R.W. was an attorney or otherwise qualified to refer clients to attorneys.

In April 2021, OCDC sent Agron a letter requesting a written response regarding a complaint by an attorney whose client had been contacted by a runner named R.W., who claimed to work with Agron.[1] Agron responded that R.W. was "wholly unknown" to him,

---

[1] A runner is a non-lawyer "who solicits personal-injury cases for a lawyer." *Runner, Black's Law Dictionary* (12th ed. 2024); *see also Runner, Black's Law Dictionary* (6th ed. 1990) (defining a "runner" as a "[p]erson who solicits business for [an] attorney from accident victims" and noting runners could also be referred to as "[a]mbulance chaser[s]"). R.W., for example, served as a runner when he solicited a client for Agron in return for $500.

2

claimed no one "representing [his] office would be authorized to call and solicit representation," and suggested the complaint was made in bad faith.

One week later, an OCDC special representative e-mailed Agron requesting additional information in the form of written responses to eight questions. The special representative warned that "[a]ny lack of candor on your part . . . will only serve to aggravate the situation." Agron denied using investigators or runners, participating in any referral programs, or paying for referrals within the prior 12 months.

On May 7, 2021, the special representative inquired whether Agron was familiar with R.W., NAC, and another individual, T.S., who had formed NAC. The special representative sent Agron a photocopy of R.W.' s NAC business card. Agron responded, "I do recall a guy named [R] that came by my office saying he had some kind of website for attorney referrals some time ago. Nothing ever came of it." Regarding T.S., Agron stated he knew T.S. worked at a chiropractic office where Agron had dropped off business cards but claimed he was unaware that T.S. had formed NAC.

Two months later, OCDC requested copies of Agron's law office operating account bank statements from October 2020 to April 2021. Agron retained counsel and sent the requested bank statements to OCDC.

In September 2021, Agron sent OCDC a "STATEMENT OF CLARIFICATION &/OR CORRECTION." Agron confessed that his initial responses to OCDC "were misleading" and he also confessed to knowing R.W., T.S., and NAC, and paying them for referrals. Further, Agron professed that he was aware T.S. worked for NAC. Agron acknowledged that he knew NAC was a pay-per-lead referral service despite T.S.'s

3

representation that the firm was merely an advertising service. Agron claimed he had reached out to peers in the legal community for mentorship and advisement moving forward. Concluding his statement, Agron admitted his "actions were not correct," expressed remorse for his "lack of transparency with OCDC's investigators," and asserted he had suspended all pay-per-lead advertising. Eventually, OCDC scheduled a disciplinary hearing panel ("DHP") proceeding for January 2024.

Between OCDC's initial investigation and the DHP hearing, Agron undertook remedial measures. He stopped utilizing pay-per-lead referral services, expanded his professional network, and secured mentor-attorneys to supervise his practice.

In November 2023, in advance of the hearing, Agron and OCDC submitted to the DHP a joint stipulation agreeing the above facts are true. The parties also stipulated to violations of the Rules of Professional Conduct, agreeing Agron violated Rule 4-5.3 by failing to make reasonable efforts to ensure R.W.'s and NAC's conduct was compatible with the professional obligations of attorneys under Rule 4; that Agron participated in an unlawful and improper lawyer referral scheme by paying $77,500 in total to R.W. and NAC in violation of Rules 4-9.1(b) and 4-7.2(c); and that Agron's dishonest and intentional misrepresentations to OCDC during its investigation violated Rules 4-8.1(a), 4-8.4(c), and 4-8.4(d).[2] Additionally, the parties stipulated to aggravating and mitigating circumstances.[3]

---

[2] Unless otherwise noted, all rule references are to Missouri Court Rules (2023), which govern this proceeding because the information was filed in June 2023.

[3] OCDC initially charged Agron with additional violations of Rules 4-7.3(a), 4-8.4(a), 4-8.4(b), and 4-9.1(m). OCDC dropped those charges prior to the DHP hearing.

While Agron and OCDC stipulated to the facts and violations of the Rules of Professional Conduct, they did not agree on a recommended discipline. OCDC concluded Agron's actions did not warrant disbarment and recommended indefinite suspension without leave to seek reinstatement for 12 months or, alternatively, six months. Agron requested probation or that any suspension imposed be stayed while he completed a term of probation.[4]

At the DHP hearing, Agron explained that, when he lied to OCDC investigators, he was under significant stress. Agron divulged that he was having marital issues when OCDC contacted him and was dismayed to learn a friend filed the initial complaint. Additionally, Agron claimed that he was mistrustful of the special representative's inquiry because he received it by e-mail and was unsure whether the sender was truly affiliated with OCDC. Agron stated that these stressors were "not an excuse in any way, shape, or form" for his misconduct. Agron also admitted that he had come to understand, prior to OCDC's inquiry, that NAC was not an advertising agency and was, in fact, securing referrals using illicit means.[5]

Shortly after the disciplinary hearing, the DHP issued a decision. The DHP adopted the parties' stipulations of fact and agreed with the parties that Agron violated Rules 4-5.3, 4-9.1(b), 4-7.2(c), 4-8.1(a), 4-8.4(c), and 4-8.4(d). Referring to sections 9.22 and 9.32 of

---

[4] Agron claims the mentor-attorneys he secured following OCDC's investigation would be willing to monitor his practice during any probation imposed.

[5] Before the DHP, Agron testified that he tried to "work with" NAC by "explain[ing] to them how these things shouldn't happen" and telling them to stop doing "focused advertising."

the *American Bar Association's Standards for Imposing Lawyer Sanctions* (1992) ("ABA Standards"), the DHP found aggravating and mitigating factors. The DHP found Agron's selfish motives, dishonesty, multiple offenses, and substantial experience in the practice of law to be aggravating factors. As for mitigating factors, the DHP then found Agron's lack of prior complaints or discipline, his pursuit of peer mentorship and advisement after confessing to his misconduct, his subsequent cooperation in the proceedings and remorse for his actions, and that, when his misconduct occurred, Agron was under a large amount of stress due to marital issues.

Looking to the range of sanctions in sections 4.3 and 4.4 of the ABA Standards and considering aggravating and mitigating factors, the DHP recommended that Agron be suspended from the practice of law without leave to seek reinstatement for six months but that the suspension be stayed during a one-year probation. Notably, the lay member of the three-person DHP filed a dissent "strongly disagree[ing]" with the DHP's decision, opining that Agron should be suspended indefinitely without staying the suspension for a term of probation. The lay member stated that, as a member of the public, he viewed Agron's attempts to cover up his misconduct by lying to be a "serious error" and that, in light of Agron's dishonesty, "he should not be representing anybody."

OCDC rejected the DHP's recommended discipline and sought this Court's review.

**Standard of Review**

"This Court has inherent authority to regulate the practice of law and administer attorney discipline." *In re Crump*, 688 S.W.3d 569, 575 (Mo. banc 2024) (internal quotations omitted). "Professional misconduct must be proven by a preponderance of the

6

evidence before discipline will be imposed." *In re McMillin*, 521 S.W.3d 604, 607 (Mo. banc 2017) (internal quotations omitted). "This Court reviews the evidence *de novo*, independently determines all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law." *Id.* (internal quotations omitted). "This Court treats the [DHP]'s findings of fact, conclusions of law, and [] recommendations as advisory" and "may reject any or all of the [DHP]'s recommendations."[6] *Id.* (internal quotations omitted).

## Analysis

This Court finds Agron committed the following violations of the Rules of Professional Conduct.

**Rule 4-9.1(b)**

Under Rule 4-9.1(b), an attorney "may participate in a service that refers them to prospective clients, but only if the service is a qualified service because it conforms to Rule 4-9.1." A qualified referral service must be registered with OCDC "and demonstrate its compliance with Rule 4-9.1 before commencing to operate." Rule 4-9.1(i)(1). Only qualified referral services are permitted to "operate for a direct or indirect purpose of referring potential clients to particular lawyers." *See* Rule 4-9.1(d).[7]

---

[6] Agron cites *In re Donaho*, 98 S.W.3d 871, 873 (Mo. banc 2003), proposing this Court should give "considerable weight" to the DHP's disciplinary suggestions. The DHP is essential to the disciplinary process, and this Court highly values its role. As *Donaho* states, however, this Court is not bound to follow the DHP's suggested discipline: "the [DHP]'s recommendation as to the appropriate measure of discipline is merely advisory." *Id.*

[7] Qualified referral services must operate for the good of "public interest." Rule 4-9.1(c). To protect the public and preserve the integrity of the legal profession, compliance

7

This Court finds Agron violated Rule 4-9.1(b) by partnering with unregistered referral services. R.W. and NAC were not registered with OCDC; therefore, neither was qualified to refer clients to Agron. Nonetheless, Agron paid for their services without investigating whether they were qualified to provide referrals. Agron admitted to the DHP that he continued to receive referrals even after he learned neither R.W. nor NAC was a qualified referral provider.

**Rule 4-5.3**

This Court finds Agron violated Rule 4-5.3. Rule 4-5.3 mandates that an attorney supervise the conduct of non-attorney assistants. A supervising attorney is responsible for any conduct by non-attorney assistants that would violate the Rules of Professional Conduct if the attorney authorizes such conduct.

As explained above, Agron paid R.W. and NAC to refer him clients. Neither was an attorney or qualified to refer clients. By paying R.W. and NAC for referrals, both became Agron's non-attorney assistants operating in violation of Rule 4-9.1. Agron failed to make reasonable efforts to ensure R.W. and NAC's conduct conformed to the Rules of Professional Conduct and continued to enlist their services after learning they were illicit referral providers.

---

requirements for referral services under Rule 4-9.1 are arduous and extensive. *See* Rule 4-9.1(c), (e), (f), (g), (i). The most basic and simplistic requirement, however, requires referral services to register with OCDC. Rule 4-9.1(i)(1).

**Rule 4-7.2(c)**

This Court finds Agron violated Rule 4-7.2(c). Rule 4-7.2(c)(3) prohibits an attorney from giving anything of value to a person or entity for recommending the attorney's services unless the person or entity is a qualified lawyer referral service registered under Rule 4-9.1. Agron paid R.W. and NAC $77,500 for 155 referrals and, as explained above, neither R.W. nor NAC was qualified to make lawyer referrals under Rule 4-9.1.

**Rule 4-8.1(a)**

This Court finds Agron violated Rule 4-8.1(a). Rule 4-8.1(a) states, in relevant part, that "a lawyer . . . in connection with a disciplinary matter shall not . . . knowingly make a false statement of material fact." Agron knowingly lied to the OCDC investigator about his knowledge of, interactions with, and payments to R.W. and NAC.

**Rule 4-8.4**

This Court finds Agron violated two sections of Rule 4-8.4 by attempting to deceive OCDC.

First, Rule 4-8.4(c) provides that an attorney commits professional misconduct when he "engage[s] in conduct involving dishonesty, fraud, deceit, or misrepresentation." Agron repeatedly violated this section when he responded dishonestly to OCDC's inquiries regarding his relationship with R.W. and NAC and misrepresented his knowledge of and relationship with both.

Second, under Rule 4-8.4(d), an attorney commits professional misconduct by "engag[ing] in conduct that is prejudicial to the administration of justice." Agron intended

9

to hinder OCDC's investigation when he made dishonest, deceitful misrepresentations and intentional false statements about his payment for referrals and relationship with R.W. and NAC. These attempts to impede OCDC's investigation were prejudicial to the administration of justice.

## Appropriate Discipline

Having found that Agron committed multiple acts of misconduct by violating the Rules of Professional Conduct, the remaining issue to be decided is the appropriate disciplinary sanction.

"The purpose of attorney disciplinary proceedings is to protect the public and maintain the integrity of the legal profession." *In re Eisenstein*, 485 S.W.3d 759, 763 (Mo. banc 2016) (internal quotations omitted). "Those twin purposes may be achieved both directly, by removing a person from the practice of law, and indirectly, by imposing a sanction [that] serves to deter other members of the Bar from engaging in similar conduct." *In re Kazanas*, 96 S.W.3d 803, 808 (Mo. banc 2003).

In addition to the attorney's ethical violations, the Court looks to "the attorney's mental state, the extent of actual or potential injury caused by the attorney's misconduct, and any aggravating or mitigating factors." *McMillin*, 521 S.W.3d at 610; *see* ABA Standard 3.0. "This Court determines appropriate discipline by considering its prior cases and the [ABA Standards]." *In re Kayira*, 614 S.W.3d 530, 533 (Mo. banc 2021) (internal citation omitted).

"When this Court finds an attorney has committed multiple acts of misconduct, the ultimate sanction imposed should at least be consistent with the sanction for the most

serious instance of misconduct among the violations." *McMillin*, 521 S.W.3d at 610. Agron's most egregious acts of misconduct are his false and deceitful statements to OCDC.

**The Presumptive Discipline**

Section 6.0 of the ABA Standards addresses violations of duties owed to the legal system. ABA Standard 6.11 provides that "[d]isbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement . . . or improperly withholds material information, and causes . . . a significant or potentially significant adverse effect on the legal proceeding."

Under ABA Standard 6.12:

> "Suspension is generally appropriate when a lawyer knows that false statements . . . are being submitted to the court or material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding."

Section 7.0 of the ABA Standards addresses violations of duties owed as a legal professional. Standard 7.1 provides that "[d]isbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."

Under ABA Standard 7.2, "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system."

"Misconduct involving subterfuge . . . and untrustworthiness undermine[s] public confidence in not only the individual but in the bar." *Donaho*, 98 S.W.3d at 874.

11

Accordingly, "[t]o protect the public, and maintain the integrity of the profession, a substantial [discipline] must be imposed" when an attorney knowingly makes dishonest statements. *Id.* "This Court considers the veracity of the attorney in disciplinary proceedings to be of great importance." *In re Stricker*, 808 S.W.2d 356, 361 (Mo. banc 1991); *see also In re Waldron*, 790 S.W.2d 456, 461 (Mo. banc 1990) (suspending an attorney for dishonesty during disciplinary investigations).

The ABA Standards define "intent" as "the conscious objective or purpose to accomplish a particular result," and "knowledge" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result."

In his "STATEMENT OF CLARIFICATION &/OR CORRECTION," Agron admitted that his responses to OCDC were "somewhat misleading." His statements, however, were more than "somewhat" misleading—they were purposeful misrepresentations. Agron lied about his relationship with and payments to R.W. and NAC with the intent to impede OCDC's investigation. Agron's lack of veracity and intentional obfuscation of facts pertinent to OCDC's inquiry warrant disbarment, or at the very least, suspension.

Accordingly, disbarment or suspension is the presumptive discipline. While OCDC stipulated that Agron's actions do not merit disbarment, its stipulation merely indicated OCDC would not seek disbarment. OCDC's stipulation does not fetter this Court's discretion to select appropriate discipline. Rule 5.17(a) permits disbarment when this Court finds "one or more violations" of the Rules of Professional Conduct, and Agron's

12

intentional misrepresentations of fact to OCDC investigators alone are sufficient to merit disbarment as the presumptive discipline. Before determining the appropriate discipline for Agron, however, this Court first must weigh mitigating and aggravating factors. *See In re Belz*, 258 S.W.3d 38, 42-44 (Mo. banc 2008).

Aggravating factors relevant to Agron's conduct are his: (1) substantial experience in the practice of personal injury law; (2) multiple violations; (3) pattern of misconduct; (4) dishonest responses to OCDC's inquiries, which Agron made to avoid the consequences of an investigation that revealed significant professional misconduct; and (5) selfish motives in paying for improper client referrals for personal financial gain. *See* ABA Standard 9.22.

Mitigating factors relevant to determining appropriate discipline are Agron's: (1) absence of prior discipline; (2) cooperative, if delayed, attitude towards disciplinary proceedings; (3) good reputation in his personal injury practice and prior role as an assistant prosecutor; (4) significant personal and emotional problems and substantial stress at the time of his dishonest responses to OCDC inquiries; (5) professed remorse for his initial failure to cooperate with OCDC; and (6) good faith efforts to rectify his misconduct by reaching out to fellow attorneys for advisement and mentorship. *See* ABA Standard 9.32.

Agron argues these mitigating factors—particularly the absence of prior discipline in his 20 years of practice and good reputation in his prior role as an assistant prosecutor—merit departure from the presumptive discipline. Mitigating factors, however, do not constitute a defense to misconduct. *Belz*, 258 S.W.3d at 42. Rather, mitigating factors "may justify a reduction in the degree of discipline to be imposed." ABA Standard 9.31.

13

Agron asserts *In re Krigel*, 480 S.W.3d 294 (Mo. banc 2016), supports his requested discipline—probation with a stayed suspension. Krigel intentionally mislead a circuit court to believe a child's father did not want to exercise his parental rights. *See id.* at 297. Krigel actively concealed information from the child's father. *Id.* He also misrepresented the father's involvement in the child's life and submitted two misleading documents to the circuit court. *Id.* at 297-300. Krigel did not admit to any of the violations of the Rules of Professional Conduct OCDC alleged against him. *Id.* at 298. The presumptive discipline for Krigel was disbarment because his most egregious misconduct was lack of candor toward the court. *Id.* at 301 (citing ABA Standard 6.11). This Court, however, determined the appropriate discipline was a stayed suspension with two-year probation. *Id.* at 302.

Because he took responsibility for his ethical violations and his misrepresentations to OCDC do not rise to the same level of misconduct as Krigel's misrepresentations to the circuit court, Agron asserts this Court should apply the same progressive discipline approach to impose a lesser sanction than the presumptive discipline.

*Krigel*, however, was an anomaly and should not be relied upon as persuasive authority for determining the appropriate discipline in a professional misconduct proceeding. The misconduct in *Krigel* was egregious, and it is highly unlikely current disciplinary norms could support the substantial deviation from the presumed discipline imposed in that case. Moreover, the circumstances of this case do not merit the substantial deviation from the presumed discipline imposed in *Krigel*.

This case also brings to the fore the deleterious consequences of attorneys using illicit referral schemes. In *In re Randolph*, 347 S.W.2d 91,111 (Mo. banc 1961), this Court

14

disbarred an attorney for paying non-attorneys for client referrals and splitting resulting fees with them. The Court stated that paying non-attorneys for referrals "lead[s] to many evils." *Id.* at 110. Paying for illicit referrals is "unfair to other members of the Bar" and "tend[s] to degrade the legal profession and breed disrespect for the courts." *Id.* Overall, "solicitation of cases and splitting fees with [non-attorneys] are in *all* aspects detrimental to the *public interest*." *Id.* (emphasis added). Rule 4-9.1 establishes stringent guidelines for attorneys and referral services in order to preserve the integrity of the legal profession and, more importantly, protect the public. Agron's payments to R.W. and NAC for referrals constitute serious ethical violations and merit appropriate discipline.

The ABA Standards' theoretical framework provides that all attorneys owe ethical duties to the general public: "The community expects lawyers to exhibit the highest standards of honesty and integrity, and lawyers have a duty to not engage in conduct involving dishonesty, fraud, or interference with the administration of justice."

After considering the facts, Agron's violations, and all aggravating and mitigating factors, this Court concludes that suspension is the appropriate discipline in this case. Agron's use of illicit referral services and attempts to mislead OCDC investigators and avoid discipline are not sufficiently mitigated to warrant probation or a stayed suspension with probation as he requests. As the DHP lay member's dissent noted: Agron's violations of the Rules of Professional Conduct constitute a "serious error" warranting discipline necessary to protect the public from his dishonesty. But Agron eventually confessed his misdeeds, cooperated with OCDC, exhibited remorse, and made good faith efforts to rectify his misconduct. These mitigating factors justify departing from disbarment.

15

## Conclusion

To protect the public and the integrity of the legal profession, Agron is suspended indefinitely from the practice of law with no leave to apply for reinstatement for 12 months.

_____

W. Brent Powell, Judge

All concur.